Margaret A. ROWE, Peter, Rowe, on their own behalf and on behalf of others similarly situated, Plaintiffs;

v.

MORGAN STANLEY DEAN WITTER, and Thomas Mullooly, Defendants.

No. CIV. A. 98–5764 (AJL).

United States District Court, D. New Jersey.

Dec. 20, 1999.

Richard M. Fricke, Fricke & Solomon, P.C., Newark, NJ, for Plaintiffs.

David J. Libowsky, Brian F. Amery, Bressler, Amery, & Ross, P.C., Morristown, NJ, for Defendants.

## OPINION

LECHNER, District Judge.

Margaret A. Rowe and Peter Rowe (collectively, the "Plaintiffs"), individually and on behalf of other persons similarly situated (the "Proposed Class"), filed a complaint (the "Complaint") against Dean Witter Reynolds Inc. ("Dean Witter")[1] and Thomas Mullooly ("Mullooly"), (collectively, the "Defendants") on 22 December 1998. The Complaint asserts violations of Sections 77q(a), 78j(b) and 78o(c)(1) of the Securities and Exchange Act of 1934 (the "Exchange Act") and the Rules promulgated thereunder, including the Securities and Exchange Commission (the "SEC") Rule 10b–5 ("Rule 10b–5") in connection with the handling of the Plaintiffs' two securities brokerage accounts maintained with the Defendants (the "Accounts"). *See* Complaint at ¶ 28.

Jurisdiction is asserted pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331. *See* Complaint at ¶ 1.

Currently pending is a motion to dismiss the class action allegations of the Complaint with prejudice for failure to state a claim upon which relief can be granted pursuant to the Federal Rules of Civil Procedure ("Fed. R. Civ.P.") 12(b)(6) ("Rule 12(b)(6)"), to compel the claims of the Plaintiffs to arbitration pursuant to the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 4 ("Section 4"), and to stay the litigation of those claims pending completion of the arbitration pursuant to 9 U.S.C. § 3 ("Section 3") of the FAA (collectively, the "Motion").[2]

1. The Complaint improperly pleaded Dean Witter Reynolds Inc. as Morgan Stanley, Dean Witter. *See* Complaint, Moving Brief at 1.

2. In support of the Motion, Defendants submitted:

Brief of Defendants in Support of Their Motion to Dismiss the Class Action Allegations of the Complaint and to Compel Arbitration and Stay This Action Pending Arbitration (the "Moving Brief"); Reply Brief of Defendants in Support of Their Motion to Dismiss the Class Action, [sic] Allegations of the Complaint and to Compel Arbitration and Stay This Action Pending Arbitration (the "Reply Brief"); Declaration of Thomas Mullooly, attaching Exhibits 1 through 3 (the "Mullooly Declaration"); Declaration of David J. Libowski, attaching Exhibit A (the "Libowski Declaration").

In opposition to the Motion, Plaintiffs submitted: Brief in Opposition to Defendants' Motion to Dismiss the Class Allegations of the Compliant and to Compel Arbitration and Stay This Action Pending Arbitration (the "Opposition Brief").

For the reasons set forth below, the Motion is granted.

*Facts* [3]

### A. *Parties*

The Plaintiffs are senior citizens and residents of the State of New Jersey. *See* Complaint at ¶ 4. Plaintiffs allege that on or about 18 February 1997 they "intrusted their life saving[s]" to the Defendants. *See id.* ¶ 10. Plaintiffs, moreover, allege on that same date they opened the Accounts. *See id.* Plaintiffs further allege Mullooly was their securities broker and advisor. *See id.* In this capacity, Plaintiffs allege Mullooly purchased and sold various securities and interests in the securities on behalf of the Plaintiffs. *See id.*

Dean Witter is alleged to be a "corporation organized and existing by virtue of the laws of one of the states of the United States . . . ." *Id.* at ¶ 3. Pursuant to an answer (the "Answer") filed by Defendants, on 16 February 1999, it appears Dean Witter maintains offices in the District of New Jersey, is registered with the National Association of Securities Dealers, Inc. (the "NASD"), and is a member of the New York Stock Exchange, Inc. ("NYSE"). *See* Answer at ¶ 3; Complaint at ¶ 3. Mullooly, moreover, is a registered representative of Dean Witter and a resident of the State of New Jersey. *Id.*

Plaintiffs bring this class action on behalf of a proposed class comprised (the "Proposed Class") of "all persons who opened accounts with Dean Witter's Manasquan and Toms River, [New Jersey] offices through Mullooly, from the point of his employment by Dean Witter through to and including July 7, 1998, inclusive (the "Class Period")." [4] Complaint at ¶ 13. The exact number in the Proposed Class is alleged to be unknown; however, the Plaintiffs speculate "there are, at minimum, in excess of twenty members of the [Proposed] Class who were clients of the [D]efendants as a result of solicitations and senior citizen seminars conducted by [D]efendant, Mullooly." *Id.* at ¶ 14 & Exhibit C.[5]

### B. *Background*

Until the end of 1997, Mullooly was employed by Dean Witter as an Associate Vice President–Investments of its office located at 1433 Hooper Avenue, Toms River, New Jersey 08753 (the "Toms River Office"). *See* Mullooly Declaration at ¶ 2. As mentioned, on or about 18 February 1997, the Plaintiffs allege to have opened their Accounts in the Toms River office with Mullooly acting as the registered representative responsible for servicing the Accounts.[6] *See* Complaint at ¶ 10.

In this regard, Plaintiffs allege Mullooly was to "act as Plaintiffs' securities broker and *advisor*." *Id.* (emphasis added). Plaintiffs also allege they "reposed complete trust in Defendants to handle their accounts in accordance with Plaintiffs investment objectives, thus giving rise to a fiduciary duty on the part of Defendants to Plaintiffs." *Id.* In

---

**3.** The facts are derived primarily from the Complaint. As discussed more fully below, for purposes of a Rule 12(b)(6) motion, the factual allegations of the complaint, as well as all reasonable inferences which may be drawn therefrom, are accepted as true. *See, e.g., Weiner v. Quaker Oats Co.,* 129 F.3d 310, 315 (3d Cir. 1997); *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1420 (3d Cir.1997); *Lewis v. Chrysler Corp.,* 949 F.2d 644, 646 n. 1 (3d Cir. 1991); *Weiner v. Quaker Oats Co.,* 928 F.Supp. 1372, 1380–81 (D.N.J.1996), *rev'd in part on other grounds,* 129 F.3d 310 (3d Cir.1997).

**4.** The Plaintiffs explain the Proposed Class as follows:

> This is a securities class action on behalf of all persons (the "class") who, at all pertinent times, were unsophisticated in, and lacking knowledge of business matters and the handling and investing of money and in particular

were unsophisticated in and lacked knowledge of matters relating to investments in the stock market who have opened accounts with [Defendants].

Complaint at ¶ 6.

**5.** A copy of an advertisement by Dean Witter for retirement planning is attached to the Complaint as Exhibit C (the "Retirement Advertisement").

**6.** The Mullooly Declaration differs from the Complaint and asserts the Plaintiffs opened the Accounts with Dean Witter in or about July 1996. *See* Mullooly Declaration at ¶ 3 & Exhibits 1 and 2. Copies of the account applications (the "Account Applications") executed by Plaintiffs are attached to the Mullooly Declaration as Exhibits 1 and 2. In addition, a copy of the Dean Witter client agreements (the "Client Agreements") are incorporated into, and appended to, the Account Applications.

addition, Plaintiffs allege, without their authorization and during the following fourteen months, Mullooly bought and sold securities in the Accounts in more than sixty transactions. *Id.* at ¶ 11. It is further alleged the transactions involved new issues and resulted in substantial commissions to the Defendants, with little financial reward to the Plaintiffs. *Id.* at Exhibits A and B.[7]

The Plaintiffs also allege Dean Witter failed to provide supervision of, or instructions to, Mullooly

> [w]ith regard to the suitability of the involved new issues for [P]laintiffs, with regard to the requirements of the national exchanges and of the National Association of Securities Dealers as to the knowledge and investment needs of [P]laintiffs' investment accounts and the knowledge and experience of [P]laintiffs in the purchase and sales of securities.

*Id.* at ¶ 12.

### C. *The Complaint*

Count one of the Complaint ("Count One") alleges Plaintiffs advised Mullooly that their "experience in the area of securities investment was extremely limited, [and] that Plaintiffs investment objective was income and growth from the funds for the purpose of retirement ...." *Id.* at ¶ 21. Count One also alleges "Plaintiffs and the [Proposed] Class, *relying on Defendants' misrepresentation,* invested into accounts opened by Defendant Mullooly with Defendant, Dean Witter." *id.* at ¶ 23 (emphasis added). In this regard, Plaintiffs assert substantial sums were taken by Mullooly, contrary to the instruction of the Plaintiffs, and placed into securities that involved new issues. *See id.* at ¶ 24.

Count One further alleges Defendants knew "Plaintiffs and the [Proposed] Class lacked sufficient investment experience and financial acumen to enable Plaintiffs and the [Proposed] Class to make informed decisions about the purchase and sale of securities." *Id.* ¶ 25. In addition, Count One alleges "the transactions executed by Defendants were *unsuitable* for the Plaintiffs and the [Pro-

posed] Class, were *excessive* in frequency and were transacted by Defendants for the Defendants' benefit and in disregard of the interests of Plaintiffs and the [Proposed] Class." *Id.* at ¶ 27 (emphasis added).

Finally, Count One alleges the acts and conduct of the Defendants were meant to "deceive and defraud Plaintiffs and the [Proposed] Class" in violation of Sections 77q(a), 78j(b) and 78o(c)(1) of the Exchange Act and the Rules promulgated thereunder, including Rule 10b–5.

Count two of the Complaint ("Count Two") alleges the Plaintiffs and the Proposed Class have been damaged during the Class Period due to the mismanagement of the accounts of both the Plaintiffs and the Proposed Class. *Id.* at ¶ 31. Count Two also alleges Mullooly knowingly effected trades in the Accounts that were *"excessive* in *size* and *frequency* in light of the *nature* of the Accounts of Plaintiffs and the [Proposed] Class as well as their *financial situation, needs and investment objectives* ...." *Id.* (emphasis added).

Count Two alleges the Defendants purposely and consciously failed to properly explain to Plaintiffs and the Proposed Class how to accurately read and interpret account statements. *Id.* at ¶¶ 32–36. Count Two further alleges the Defendants "worked a constructive fraud on Plaintiffs and the [Proposed] Class and constituted a breach of fiduciary duty on the part of Defendants." *Id.* at 34.

Count three of the Complaint ("Count Three") alleges "Mullooly was *not* given discretionary authority over the accounts of Plaintiffs and the [Proposed] Class. However, he routinely bought and sold securities in the Accounts of Plaintiffs and the [Proposed] Class, without their approval, authorization or knowledge." *Id.* at ¶ 41 (emphasis added). Count Three further alleges Mullooly "did not advise Plaintiffs that transactions that had been made without authorization could be rejected." *Id.* at ¶ 43.

In addition, Count Three alleges Dean Witter had "full knowledge of the circum-

---

**7.** Copies of the transactions in the Accounts, stating the commissions, client gain/loss and a summary of the transactions are attached to the Complaint as Exhibits A and B. *See* Complaint at Exhibit A & B.

stances attending the transactions" by Mullooly. *Id.* at ¶ 38. Count Three further alleges Dean Witter failed to properly supervise, instruct and enforce a proper system of internal supervision over Mullooly in violation of its duty as a "control person" within the meaning of the Exchange Act. *See id.* Count Three, moreover, alleges Dean Witter failed to advise Plaintiffs and the Proposed Class of the prior misconduct of Mullooly at his previous place of employment, which resulted in the termination of Mullooly on 2 March 1990. *See Id.* at ¶¶ 38, 39, 44. Finally, Count Three alleges Plaintiffs and the Proposed Class are entitled to punitive damages for the unsuitable trading, misrepresentations and omissions of Mullooly that were done "fraudulently, intentionally and with wanton and reckless disregard of the financial needs of Plaintiffs and the [Proposed] Class." *Id.* at ¶¶ 43, 45–47.

Count four of the Complaint ("Count Four") again alleges Defendants effected trades in the accounts of the Plaintiffs and the Proposed Class *without* prior specific authorization. *See id.* at ¶ 49. Count Four further alleges Defendants made transactions without the discretion or power of attorney on behalf of Plaintiffs and the Proposed Class. *See id.* Finally, Count Four

alleges that as, a proximate result of the unauthorized trades by Defendants, Plaintiffs and the Proposed Class have been damaged during the Class Period. *See id.* at ¶¶ 49–50.

Pursuant to the Complaint, Plaintiffs, on behalf of themselves and the Proposed Class, ask for a declaration that this action is a proper class action and that Plaintiffs are proper class representatives. *See id.* at ¶ A.

### D. *The Class Allegations*

Plaintiffs assert the instant class action is brought pursuant to Fed.R.Civ.P. 23(a) ("Rule 23(a)")[8] and 23(b)(3) ("Rule 23(b)(3)").[9] *See* Complaint at ¶ 13. Plaintiffs also allege the members of the Proposed Class[10] are "so numerous that joinder of all members is impracticable .... Plaintiffs believe there are, at minimum, twenty-members of the Proposed Class who were clients of the defendants as a result of solicitations and senior citizen seminars conducted by [D]efendant, Mullooly." *Id.* at ¶ 14.

In addition, Plaintiffs contend their claims are typical of the claims of the Proposed Class "as Plaintiffs and all members of the [Proposed] Class sustained damages arising out of Defendants' wrongful conduct in violation of [F]ederal law ...." *Id.* at ¶ 16.

---

**8.** Rule 23(a) provides:

(a) Prerequisites to a Class Action. On or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).

**9.** Rule 23(b)(3) provides an action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied and in addition:

The court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed.R.Civ.P. 23(b)(3).

**10.** As noted, Plaintiffs further define the Proposed Class as all persons:

who, at all pertinent times, were unsophisticated in, and lacking knowledge of business matters and the handling and investing of money and in particular were unsophisticated in and lacked knowledge of matters relating to investments in the stock market who have opened accounts with defendant, Dean Witter, through its broker, defendant Thomas Mullooly.

Complaint at ¶ 6.

At a status conference, held 10 February 1999, (the "10 February 1999 Conference"), Richard Fricke, Esq., counsel to Plaintiffs, represented to the court the Complaint further limited the Class to senior citizens, over 50:

Fricke: I think I also limited it to senior citizens

The Court: Well—

Fricke: —over 50.

*See* 10 February 1999 Conference Transcript at 3:22–25.

It appears the Complaint alleges the Plaintiffs, as senior citizens, have limited investment and/or financial acumen. *See e.g.* Complaint at ¶ 21. The Complaint, however, does not purport to limit the Proposed Class to senior citizens over fifty years of age.

Plaintiffs further contend a class action is superior to other available methods for fair and efficient adjudication of this controversy because joinder of all members of the Proposed Class is impracticable. To that end, Plaintiffs allege that "because the damages suffered by certain members of the [Proposed] Class may be relatively small," the expense and burden of individual litigation make it impossible for the [Proposed] Class to individually redress the wrongs done to them. *See id.* at ¶ 18.

Plaintiffs allege the following questions of law and fact are common to all members of the Proposed Class

(a) Whether the federal securities laws were violated by Defendants' acts as alleged here;

(b) Whether the Defendants' were involved in the fraudulent mismanagement of customer accounts;

(c) Whether the Defendants' were involved in excessive and unauthorized trading of customer accounts ("churning");

(d) Whether the Defendants' were involved in unsuitable transactions on customer accounts;

(e) Whether the Defendants were involved in failing to obtain client approval of transactions; and

(f) Whether the Defendants breached their fiduciary duties to their customers in complete indifference and conscious disregard for the best interests of their customers.

*Id.* at ¶ 15.

### E. *Procedural History*

At the 10 February 1999 Conference, leave was given to Defendants to file an answer, without prejudice to the subsequent filing of a motion to dismiss. *See* 10 February Status Conference Record at 6.[11] On 16 February 1999, Defendants filed the Answer. *See* Answer. Furthermore, during the 10 February Status Conference, the outstanding discovery

requests made by the Plaintiffs were stayed. *See* 10 February 1999 Status Conference Record at 10. In addition, pursuant to the 10 February Status Conference, both parties were instructed to research the viability of class action status. *Id.* at 11.

At a subsequent status conference, held 1 March 1999 (the "1 March 1999 Status Conference"), Defendants indicated they intended to file a motion to dismiss the class action. *See* 1 March 1999 Status Conference Record at 2. In addition, pursuant to the 1 March 1999 Status Conference, all discovery was stayed pending the outcome of the motion to dismiss. *Id.*

During the 1 March 1999 Status Conference, Plaintiffs requested the court permit "some preliminary discovery with respect to not the contentions in the case from the standpoint of the allegations, but from the standpoint of attempting to establish a class and course of conduct." Id. at 4. In response to this request, Plaintiffs were granted leave to file a ten page brief explaining why discovery should be permitted. *Id.* at 5. Defendants were also given leave to file a ten page brief in opposition to the discovery request made by Plaintiffs. *Id.* By letter, dated 3 March 1999, (the "3 March 1999 Letter"), Plaintiffs withdrew the "preliminary" discovery request. *See* Libowsky Declaration, Exhibit A.[12]

### *Discussion*

#### A. *Standard For Dismissal Under Rule 12(b)(6)*

■ A court may dismiss a complaint pursuant to Rule 12(b)(6) for failure to state a claim where it appears beyond doubt that no relief could be granted under any set of facts which could be proved consistent with the allegations. *See Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 811, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993); *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80

---

**11.** Because Defendants were permitted to file an answer without prejudice to a motion to dismiss, the Plaintiffs' assertion that the "post-answer Rule 12(b)(6) motion is untimely" is in error. *See* Opposition Brief at 3.

**12.** A copy of the 3 March 1999 Letter is attached to the Libowsky Declaration as Exhibit A.

(1957); *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 315 (3d Cir.1997); *Unger v. National Residents Matching Program*, 928 F.2d 1392, 1395 (3d Cir.1991); *Markowitz v. Northeast Land Co.*, 906 F.2d 100, 103 (3d Cir.1990); *Ransom v. Marrazzo*, 848 F.2d 398, 401 (3d Cir.1988).

■ Because granting a motion under Rule 12(b)(6) can result in a dismissal at an early stage of a case, all allegations set forth by a plaintiff must be taken as true and all reasonable factual inferences drawn in his or her favor. *See Gomez v. Toledo*, 446 U.S. 635, 636, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); *Bald Eagle Area School Dist., et al. v. Keystone Financial, Inc., et al.*, 189 F.3d 321 (3d Cir.1999); *Weiner*, 129 F.3d at 315; *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir.1997); *Piecknick v. Pennsylvania*, 36 F.3d 1250, 1255 (3d Cir. 1994); *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir.1994); *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 279–80 (3d Cir.), *cert. denied*, 506. U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992); *Schrob v. Catterson*, 948 F.2d 1402, 1405 (3d Cir.1991); *Unger*, 928 F.2d at 1395; *Markowitz v. Northeast Land Co.*, 906 F.2d 100, 103 (3d Cir.1990); *Melikian v. Corradetti*, 791 F.2d 274, 277 (3d Cir.1986).

■ A complaint should not be dismissed unless it appears beyond doubt that "the facts alleged in the complaint, even if true, fail to support the claim." *Ransom*, 848 F.2d at 401; *Shapiro*, 964 F.2d at 279–80. Legal conclusions made in the guise of factual allegations, however, are not given a presumption of truthfulness. *See Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986); *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir.1997) ("[A] court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss"); *Haase v. Webster*, 807 F.2d 208, 215 (D.C.Cir.), *vacated on other grounds*, 835 F.2d 902 (D.C.Cir.1987); *Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Cir. 1981), *aff'd*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983); *Western Mining Council v. Watt*, 643 F.2d 618, 626 (9th Cir.), *cert. denied*, 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981); *Bermingham v. Sony Corp. of Am.*, 820 F.Supp. 834, 846 (D.N.J.), *aff'd*, 37 F.3d 1485 (3d Cir.1994).

■ A District Court reviewing the sufficiency of a complaint has a limited role. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support his [or her] claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1420; *Bermingham*, 820 F.Supp. at 846. Generally, when conducting such an inquiry, material beyond the pleadings should not be considered. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426; *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993), *cert. denied*, 510 U.S. 1042, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994); *Wallace v. Systems & Computer Tech. Corp.*, No. 95–6303, 1997 WL 602808, at *5 (E.D.Pa.1997); *Gannon v. Continental Ins. Co.*, 920 F.Supp. 566, 574 (D.N.J.1996).

Documents expressly relied upon or integral to the complaint and matters of public record, if the claims of the plaintiff are based upon such documents, may be considered. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426; *In Re Westinghouse Sec. Litig.*, 90 F.3d 696, 707 (3d Cir.1996); *In re Donald J. Trump Sec. Litig.*, 7 F.3d 357, 368 n. 9 (3d Cir.1993), *cert. denied*, 510 U.S. 1178, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994); *Pension Benefit Guar. Corp.*, 998 F.2d at 1196; *Wallace*, 1997 WL 602808, at *5; *Weiner*, 928 F.Supp. at 1380; *Gannon*, 920 F.Supp. at 574. Such documents, however, must be explicitly relied upon or integral to the complaint. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426 (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir.1996)).

■ The failure of a plaintiff to attach or cite documents in the complaint does not preclude a court from reviewing the text of extrinsic documents. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426. The rationale underlying this exception is that the primary problem raised by looking to documents outside the complaint (lack of notice to the plaintiff) is dissipated "[w]here

plaintiff has actual notice ... and has relied upon these documents in framing the complaint." *Id.* (quoting *Watterson v. Page,* 987 F.2d 1, 3–4 (1st Cir.1993)). The exception primarily seeks to prevent

> [t]he situation in which a plaintiff is able to maintain a claim of fraud by extracting an isolated statement from a document and placing it in the complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent.

*Id. See also Shaw,* 82 F.3d at 1220 (1st Cir.1996).

Under these circumstances, reference to documents outside the complaint does not convert a motion to dismiss into a motion for summary judgment. *See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1426; *Pension Benefit Guar. Corp.,* 998 F.2d at 1196–97.[13]

### B. *Dismissal of Class Action Allegations*

Defendants seek, *inter alia,* to dismiss the class action allegations of the Complaint with prejudice, for failure to state a claim upon which relief can be granted. *See generally* Moving Brief at 1 & 5–14. In particular, Defendants contend "[a]s a matter of law [the instant action] cannot be maintained as a class action. Plaintiffs' claims of churning, unsuitable trading and unauthorized trading raise mostly individual issues which would predominate over any common issues of law or fact." *Id.* at 5. "Moreover, the putative class is too small and geographically compact to satisfy the numerosity requirement." *Id.* at 6. In sum, Defendants argue the class action brought by Plaintiffs cannot satisfy Rule 23(b)(3) or Rule 23(a), and therefore, the claims of the Plaintiffs "are completely

ill-suited for class treatment."[14] *Id.* (citations omitted).

#### 1. *Rule 23(b)(3) Requirements*

As mentioned, Plaintiffs assert the instant class action is brought, *inter alia,* pursuant to Rule 23(b)(3). *See* Complaint at ¶ 13. Pursuant to Rule 23(b)(3), a class action may only be maintained if it is determined the questions of law or fact common to the class predominate over any questions affecting only individual members. *See* Rule 23(b)(3). The predominance inquiry of Rule 23(b)(3) "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *See Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 119 S.Ct. 2295, 2307 n. 12, 144 L.Ed.2d 715 (1999) (citing *Amchem Products, Inc. v. Windsor et al.,* 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). "That inquiry trains on the legal or factual questions that qualify each class member's case as a genuine controversy ...." *Amchem,* 521 U.S. at 623, 117 S.Ct. 2231. As noted, class actions, moreover, are maintainable under Rule 23(b)(3) only when the prerequisites of Rule 23(a) are satisfied. *See* Rule 23(b)(3).

#### a. *CHURNING*

Plaintiffs allege Defendants were involved in excessive and unauthorized trading of customer accounts. *See* Complaint at ¶¶ 15, 27, 31, 45. In particular, Plaintiffs allege that during a fourteen month period Defendants purchased and sold securities in the accounts of Plaintiffs in more than sixty transactions. *See id.* at ¶ 11. Plaintiffs, moreover, contend the alleged churning of their accounts by Defendants presents a common question of law or fact as to all members of the Proposed Class. *See id.* at ¶ 15.

---

**13.** As mentioned, in support of the Motion, Defendants submitted the Mullooly Declaration. *See supra* n. 3. Attached to the Mullooly Declaration, as exhibits 1 and 2 are the Account Applications and Client Agreements executed by Plaintiffs. *See supra* n. 6. Because the Account Applications and Client Agreements are integral to the instant action, but not attached to the Complaint, reliance on these documents does not convert the instant Motion into a motion for summary judgment.

**14.** Ruling on a dispositive motion prior to addressing class certification issues may be appropriate, in some cases, where there is sufficient doubt regarding the likelihood of success on the merits of the claims of plaintiff, *see Allen v. Aronson Furniture Co.,* 971 F.Supp. 1259, 1261 (N.D.Ill.1997), where inefficiency would result, *see Marx v. Centran Corp.,* 747 F.2d 1536, 1552 (6th Cir.1984), or where neither plaintiffs nor members of the putative class would be prejudiced. *See Thompson v. County of Medina,* 29 F.3d 238, 241 (6th Cir.1994).

By contrast, Defendants argue the churning claim asserted by the Plaintiffs "is a highly individualized and fact sensitive inquiry dependent upon such factors as, *inter alia*, plaintiffs' investment objectives and personal qualities as well as the specifics of the account relationship with defendants." *See* Moving Brief at 8 (citations omitted). Defendants, therefore, argue the churning claim cannot satisfy the requirements of Rule 23(b)(3) because "individual issues ... predominate over any common questions of law or fact that may be common to the putative class." *Id.* at 6.

Churning "is a shorthand expression for a type of fraudulent conduct in a broker-customer/investor relationship." *Craighead v. E.F. Hutton & Company, Inc.*, 899 F.2d 485, 489 (6th Cir.1990) (citing *Armstrong v. McAlpin*, 699 F.2d 79, 90 (2d Cir.1983)). Churning occurs when a broker "overtrades" the account of a customer to generate inflated sales commissions, in violation of Rule 10(b)-5. *See Morani v. Landenberger*, 196 F.3d 9, 12 (1st Cir.1999); *Freundt–Alberti, et al. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 134 F.3d 1031, 1032 (11th Cir. 1998); *Glass v. Kidder Peabody & Co., Inc., et al.*, 114 F.3d 446, 447 n.1 (4th Cir.1997); *Bowley v. Stotler & Co., et al.*, 751 F.2d 641, 644 (3d Cir.1985); *Angelastro v. Prudential–Bache Sec., Inc., et al.*, 764 F.2d 939, 943 n. 6 (3d Cir.1985); *Keyes Martin & Co., et al. v. Prudential Bache Sec., Inc.*, 1991 WL 152789, *5 (D.N.J. 29 July 1991).

■ The elements that must be proved to make out a claim for churning are: (1) the broker-dealer, or his agent, engaged in excessive trading in light of the character of the account or investment objectives of the investor; (2) the broker in question exercised control over the trading in the account; and (3) the broker acted with the intent to defraud or with willful and reckless disregard for the interests of the investor. *See Freundt–Alberti*, 134 F.3d at 1032 (11th Cir. 1998); *Meyers v. Commodity Futures Trading Com.*, 1994 WL 362727, *5 (9th Cir. 13 July 1994); *Indemnified Capital Invest., SA v. R.J. O'Brien & Assoc.*, 12 F.3d 1406, 1412 n. 6 (7th Cir.1993); *Morris v. Commodity Futures Trading Com.*, 980 F.2d 1289, 1295 (9th Cir.1992); *O'Connor v. R.F. Lafferty & Co., Inc.*, 965 F.2d 893, 897 (10th Cir.1992); *Manela v. Garantia Banking Ltd., et al.*, 5 F.Supp.2d 165, 173 (S.D.N.Y.1998)("The gravamen of the [churning] claim is the use of the broker's authority over the account to generate excessive commissions while at the same time leading his customer to believe that he is attempting to fulfill the customer's investment objectives."); *Keyes Martin & Co.*, 1991 WL 152789 at *5 (citing *Bowley*, 751 F.2d at 644).

To properly establish the control element in a churning claim, a plaintiff must first allege the account of the investor is discretionary, or set out other facts which would establish the broker's control.[15] *See Lehoczky v. Commodity Futures Trading Com.*, 1997 WL 606863, *2 (2d Cir. 1 Oct. 1997); *Meyers*, 1994 WL 362727 at *5 (citing *Morris*, 980 F.2d at 1295). Even if an account is non-discretionary, a broker may exercise "de facto control" if an investor places his trust and faith in a broker and routinely follows the advice of his broker. *See Meyers*, 1994 WL 362727 at *5 (citing *Morris*, 980 F.2d at 1295).

■ In the instant action, Plaintiffs allege their accounts and the accounts of the Proposed Class were non-discretionary, implying the Defendants assumed de facto control over their accounts. *See* Complaint at ¶ 41.[16]

---

15. A discretionary account is one in which a broker has authority to make trading decisions without the consent or prior approval of the investor. *See O'Connor*, 965 F.2d at 898 (noting the characteristic of a discretionary account). *Cf. Bowley*, 751 F.2d at 644 (stating a non-discretionary securities account is one in which a broker is not formally granted sole authority to make trading decisions).

As mentioned, a primary inquiry in any churning claim is whether a broker exhibited the requisite control over an account. *See Freundt–*

*Alberti*, 134 F.3d at 1032. Typically, when a churning claim is brought on a discretionary account, broker control may be clear because a broker can execute trading activity without prior authorization from an investor. *See Meyers*, 1994 WL 362727 at *6.

16. The Complaint specifically alleges "Defendant, Mullooly, was not given discretionary authority over the accounts of [P]laintiffs and the [Proposed] Class. However, he routinely bought and sold securities in the accounts of the Plain-

Determining whether a broker assumed de facto control over an account requires a factually intensive analysis. *See Morris,* 980 F.2d at 1295. *See also In the matter of Candy,* Release No. 41250, 1999 SEC LEXIS 669 (5 April 1999) (SEC determined in light of the fact-driven analysis required to establish broker control in the churning context, and because only four of twenty-one customers testified at an administrative hearing, broker control could be established for only the testifying customers).

Typically, several factors are considered in determining whether a broker has assumed control over a non-discretionary account. Included among these are the age, education, intelligence and investment experience of the investor, whether the broker was socially or personally involved with the investor (it may be concluded that a customer relinquished control because of a relationship of trust and confidence), whether many of the transactions occurred without the investor's prior approval (this may be interpreted as an usurpation of control by the broker) and, whether a broker and investor spoke frequently with each other regarding the status of the account or the prudence of a particular transaction (an investor, by maintaining such an active interest in the account, may be found to have maintained control over said account). *See Meyers,* 1994 WL 362727 at *5

(citing *Morris,* 980 F.2d at 1295); *Bowley,* 751 F.2d at 644.

Indeed, a touchstone for determining control is whether an investor has sufficient intelligence and understanding to evaluate the recommendations of a broker and to reject an investment opportunity if he or she regards it as unsuitable. *See Lehoczky,* 1997 WL 606863 at *2; *Meyers,* 1994 WL 362727 at *5; *Morris,* 980 F.2d at 1296 (citing *Follansbee v. Davis, Skaggs & Co., Inc.,* 681 F.2d 673, 677 (9th Cir.1982)); *Bowley,* 751 F.2d at 648 (same).[17]

For example, in *Meyers* a plaintiff instituted an action by alleging churning, unauthorized trading, and failure to supervise in connection with a commodity futures account concerning the cattle industry. *Meyers,* 362727 at *1. After a three-day hearing conducted by an administrative law judge (the "AJL"), the AJL issued a decision dismissing all three claims asserted by plaintiff. *Id.* The plaintiff, in turn, filed a notice of appeal with the Commodity Futures Trading Commission (the "CTFC"). *See id.* The CTFC, however, summarily issued an order affirming the decision. *See id.*

The Ninth Circuit, in affirming the order issued by the CTFC, focused primarily on whether the defendant could have asserted either actual or de facto control over the account. *See id.* at *6. In this regard, the

---

tiffs and the [Proposed] Class, without their approval, authorization, or knowledge." Complaint at ¶ 41.

In contrast to these allegations, Plaintiffs also allege they "entrusted their life saving[s] with the Defendants." Complaint at ¶ 10. In this regard, Plaintiffs allege "Mullooly was to act as Plaintiffs securities broker and *advisor.*" *Id.* (emphasis added). In addition, Plaintiffs allege they "reposed complete trust in the Defendants." *Id.* The Plaintiffs further allege they trusted Defendants to handle their accounts in accordance with their particular "investment objectives." *Id.*

The allegations in the instant action not only appear to conflict with a generic non-discretionary account(one in which a broker does not have sole authority over activity in an account), but they also highlight the individual character and fact intensive inquiry which must be undertaken to prove the claims asserted by the Plaintiffs. It appears such an individualized and fact intensive inquiry would be required concerning each member of the Proposed Class.

17. It appears, in all but the most extreme cases of churning, a broker may argue a given investor was consulted regarding the particular trading activity in question and the investor had the opportunity to decline such activity. In response, an investor may allege he or she was unsophisticated and/or lacked the requisite financial acumen in the arena, and simply relied on the broker and consistently followed the recommendations of the broker. As well, a broker may argue that the failure of the investor to complain about, or even question, a trade following receipt of a conformation of such trade or receipt of the monthly statement was in fact acquiescence, if not approval, of the trade.

Indeed, in the instant action, Plaintiffs allege they are "senior citizens ... [and their] experience in the area of securities investment was extremely limited ...." Complaint at ¶ 21. Plaintiffs further allege "at all times pertinent to this Complaint, Plaintiffs reposed complete trust in Defendants to handle their accounts in accordance with Plaintiffs' investment objectives ...." Complaint at ¶ 10.

Ninth Circuit considered several individualized factors pertaining to the plaintiff and the account in question.

For example, the Ninth Circuit noted the plaintiff, while having no prior trading experience, was knowledgeable about the industry in question. *Id.* The plaintiff, moreover, was not uneducated or unsophisticated, and in fact, was attending a university at the time of the alleged churning. *Id.* In addition, the plaintiff initiated all trades relevant to the account. Finally, the Ninth Circuit observed, the plaintiff dedicated a great deal of time to the management of the account. *Id.* The Ninth Circuit, therefore, affirmed the decision of the CTFC. *Id.* at *6 & *7.

As mentioned, the predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Ortiz,* 527 U.S. at ——, 119 S.Ct. at 2307 n. 12. (citing *Amchem,* 521 U.S. at 623, 117 S.Ct. 2231). The Supreme Court, moreover, has observed the predominance inquiry is a demanding one. *See Amchem,* 521 U.S. at 624, 117 S.Ct. 2231.

In *Amchem,* the Court affirmed the decision by this Circuit to decertify a class consisting of all current and future asbestos-related claimants.[18] *Id.* at 629, 117 S.Ct. 2231. In reaching its decision, the Court initially analyzed the predominance inquiry of Rule 23(b)(3). *Id.* at 622–624, 117 S.Ct. 2231.

In this regard, the Court focused, *inter alia,* on the disparate questions undermining class cohesion as highlighted by the Circuit. *Id.* at 624, 117 S.Ct. 2231. For example, the potential class members were exposed to different asbestos-containing products, for different amounts of time and in different ways. *Id.* Each potential class member, moreover, had a unique medical history which further separated him or her from every other potential member of the class. In addition, proposed class members who were suffering from asbestos-induced illnesses shared little

in common with the "exposure-only" plaintiffs. *Id.*

The Court, therefore, held: "Given the greater number of questions peculiar to the several categories of class members, and to individuals within each category, and the significance of those uncommon questions, any overarching dispute about the health consequences of asbestos exposure cannot satisfy the Rule 23(b)(3) predominance standard." *Id.* at 624, 117 S.Ct. 2231.

In the instant action, the individual nature of the Plaintiffs' churning claim similarly gives rise to significant individual questions of fact which predominate over any commonality shared by the Proposed Class. Certifying a class based on the instant churning claim would not follow the counsel of caution implicit in the design of Rule 23(b)(3). *See Id.* at 625, 117 S.Ct. 2231.

Plaintiffs' definition of the Proposed Class is premised upon several conjunctive requirements (tailored in part, to the elements of the asserted churning claim) concerning business and investment matters in general and investing in the stock market in particular, which would require a intensive fact finding with regard to each proposed class member.

> This is a securities class action on behalf of all persons (the "class") who, at all pertinent times, were [ (1) ] unsophisticated in, and [ (2) ] lacking knowledge of business matters and the handling and investing of money and in particular were [ (3) ] unsophisticated in and [ (4) ] lacked knowledge of matters relating to investments in the stock market who have opened accounts with [Defendants].

Complaint at ¶ 6 (emphasis added).

Plaintiffs, moreover, allege they "reposed complete trust" in Mullooly to handle their accounts. *See* Complaint at ¶ 10. In addition, the investment objectives of the Plaintiffs are alleged to be "income and growth." *See id.* at 21. It is unclear, however, whether each Proposed Class member similarly "reposed complete trust" in Mullooly, or

---

18. In describing the class, the Supreme Court observed: "The class proposed for certification potentially encompasses hundreds of thousands, perhaps millions, of individuals tied together by this commonality: each was, or some day may

be, adversely affected by past exposure to asbestos products manufactured by one or more of [twenty] companies." *Amchem,* 521 U.S. at 597, 117 S.Ct. 2231.

what the specific investment objectives of each was.

As discussed, a churning claim is necessarily premised on excessive trading which, in turn, is directly connected to the investment objectives of a given plaintiff. *See Meyers*, 1994 WL 362727 at *5 (citing *Morris*, 980 F.2d at 1295). Excessive trading, therefore, can only be evaluated by inquiring into the character of the account of an investor, as well as the character of the investor. *Id.* Upon review of the Complaint, it is clear the character of an account is investor specific. *See* Complaint at ¶ 21.

More importantly, a plaintiff must establish the broker exercised control over the account. *Id.* As mentioned, determining whether a broker exhibited control over an account, in particular a non-discretionary account, requires a fact intensive review of such factors as the age, education and intelligence of each account holder, *see Lehoczky*, 1997 WL 606863 at *2; *Morris*, 980 F.2d at 1295, in addition to investor involvement or investor acquiescence or approval.

Like the varying medical history of each plaintiff in *Amchem*, the investment objectives, financial acumen, account character, investor involvement or monitoring and investor acquiescence or approval (all vital factors in any churning claim) are similarly specific to Plaintiffs and each member of the Proposed Class. *See Amchem*, 521 U.S. at 625, 117 S.Ct. 2231. Because it appears the churning claim alleged by the Plaintiffs rests predominately on individual issues of fact, rather than common questions affecting the Proposed Class, the churning claim cannot satisfy the predominance inquiry of Rule 23(b)(3).[19] *See id.*

19. Although not mentioned, much more briefed by the parties, evaluating whether a churning claim is barred by the requisite limitations period appears to place such a claim even further outside the intended scope of Rule 23.

20. Rule 405 provides, in pertinent part:
Every member organization is required ... to (1) Use due diligence to learn the essential facts relative to every customer, every order, every cash or margin account accepted or carried by such organization.
New York Stock Exchange Rule 405.

### b. *UNSUITABILITY*

As mentioned, Plaintiffs allege the transactions executed by the Defendants in the Accounts were similarly unsuitable for both Plaintiffs and the Proposed Class. *See* Complaint at ¶ 15 & 27.

The Defendants, however, argue the unsuitability claim, like the churning claim asserted by the Plaintiffs, "is equally individualized and not susceptible to class treatment." Moving Brief at 9. In addition, the Defendants maintain "there is absolutely nothing about a claim for unsuitable trading which in any respect lends itself to class treatment." *Id.* at 10.

The unsuitability doctrine is premised on New York Stock Exchange Rule 405 ("Rule 405")(also referred to as the "Know Your Customer Rule")[20] and the National Association of Securities Dealers Rules of Fair Practice.[21] *See e.g. O'Connor*, 965 F.2d at 897.

■ Plaintiffs who allege a claim of unsuitability pursuant to Section 10(b) must establish five elements: (1) the securities purchased were not suited to the buyer's needs; (2) the defendant knew or reasonably believed the securities were not suited to the buyer's needs; (3) the defendant recommended or purchased the unsuitable securities for the buyer anyway; (4) the defendant made material misrepresentations with scienter (or, owing a duty to the buyer, failed to disclose material information) relating to the suitability of the securities; and (5) the buyer justifiably relied to his or her detriment on the defendant's fraudulent conduct. *See Banca Cremi, S.A., et al. v. Alex Brown & Sons, Inc. et al.*, 132 F.3d 1017, 1032 (4th Cir.1997); *Brown v. E.F. Hutton Group, Inc. et al.*, 991 F.2d 1020, 1031 (2d Cir.1993);

21. Article 3, § 2 of the Rules of Fair Practice states:

> In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such a customer upon the basis of the facts, if any, disclosed by such customer, as to his other securities holdings and as to his financial situation and need.

N.A.S.D., Rules of Fair Practice, Article 3, § 2.

*National Union Fire Ins. Co. v. Woodhead,* 917 F.2d 752, 757 (2d Cir.1990); *Pits, Ltd. v. American Express Bank Int.,* 911 F.Supp. 710, 718 (S.D.N.Y.1996).

Scienter may be inferred by finding the defendant knew or reasonably believed the securities were unsuited to the needs of the particular investor, misrepresented or failed to disclose the unsuitability of the securities, and nevertheless proceeded to recommend or purchase the securities. *See Brown,* 991 F.2d at 1031. *See generally Weiner v. Quaker Oats Co.,* 129 F.3d 310, 315 (3d Cir.1997); *Kline v. First Western Government Securities, Inc.,* 24 F.3d 480, 487 (3d Cir.), cert. denied, 513 U.S. 1032, 115 S.Ct. 613, 130 L.Ed.2d 522 (1994).

Analytically, an unsuitability claim is a subset of the ordinary Section 10(b) fraud claim, *Brown,* 991 F.2d at 1031, in which a plaintiff must allege, *inter alia,* "that the defendant made a misrepresentation or omission of a material fact, that the defendant acted with knowledge or recklessness, that the plaintiff reasonably relied on the misrepresentation or omission, and consequently suffered damage." *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 537 (3d Cir.1999)(quoting *In re Westinghouse Sec. Litig.,* 90 F.3d 696, 710 (3d Cir.1996)). *See also Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., et al.,* 135 F.3d 266, 269 (3d Cir.1998); *Weiner v. Quaker Oats Co., et al.,* 129 F.3d 310, 315 (3d Cir.1997). The burden on a plaintiff, therefore, with respect to reliance and an unsuitability claim, as in other Section

10(b) and Rule 10b–5 actions, may vary depending on whether the claim alleges fraudulent representations or fraudulent omissions. *See Brown,* 991 F.2d at 1031. *See also Burke v. Jacoby,* 981 F.2d 1372, 1378–79 (2d Cir.1992).

An investor may not justifiably rely [22] on a misrepresentation if, through minimal diligence, the investor should have discovered the truth. *Hunt v. Alliance North American Gov't Income Trust, Inc.,* 159 F.3d 723, 730 (2d Cir.1998); *Banca Cremi, S.A.,* 132 F.3d at 1027; *Harsco Corp. v. Segui, et al.,* 91 F.3d 337, 342 (2d Cir.1996); *Paracor Finance, Inc. v. General Elec. Capital Corp.,* 79 F.3d 878, 886 (9th Cir.1996); *Harrison v. Dean Witter Reynolds, Inc.,* 79 F.3d 609, 618 (7th Cir.1996). Section 10(b) liability, therefore, cannot be imposed when the conduct of an investor rises to the level of recklessness.[23] *Hunt,* 159 F.3d at 730 (2d Cir.1998). *See also Brown,* 991 F.2d at 1033.

To determine whether an investor acted recklessly, and therefore without justifiable reliance, no single factor is dispositive. All relevant factors must be considered and balanced. *Brown,* 991 F.2d at 1033. For example, the Third Circuit considers at least five factors in determining the reasonableness of the reliance alleged by a plaintiffs. These factors include a plaintiff's sophistication, whether a long-standing business or personal relationship among the parties existed, access to relevant information, whether a fiduciary relationship between the parties existed,[24] and whether the plaintiff had an

---

**22.** In the instant action Plaintiffs allege "[a]t all times pertinent to [the] Complaint, [they] reposed complete trust in [D]efendants to handle their accounts in accordance with [their] investment objectives, thus giving rise to a fiduciary duty on the part of [D]efendants to [P]laintiffs." Complaint at ¶ 10.

**23.** In *Brown,* investors who purchased interests in an oil and natural gas limited partnership brought an action asserting, *inter alia,* securities fraud against account representatives involved in the partnership offering. *See Brown,* 991 F.2d at 1020. On appeal of a grant of summary judgment for defendants, the Second Circuit affirmed and held plaintiffs could not have justifiably relied on alleged oral assurances of suitability. *Id.* at 1033.

The offering materials in *Brown* primarily consisted of a brochure and a prospectus. *Id.* at

1028–29. The plaintiffs, however, argued they relied on oral assurances made by account executives as to the low risk, conservative character and overall suitability of the investment. *Id.* at 1031.

Upon review of the brochure and prospectus, the Circuit determined, because the oral assurances were contradicted by the offering materials, reliance on the part of the plaintiffs on those assurances was not justified as a matter of law. *Id.* In sum, the Circuit held the "[plaintiffs'] asserted reliance on the brokers' alleged oral statements ... was therefore reckless and unjustifiable." *Id.*

**24.** Whether a plaintiff reviewed and checked monthly statements and/or confirmations from his or her broker is but one example of an opportunity to detect fraud. Such an inquiry is unique to each investor.

opportunity to detect the alleged fraud. *See Kline v. First Western Gov't Secs., Inc.*, 24 F.3d 480, 488 (3d Cir.), *cert. denied, Arvey, Hodes, Costello & Burman v. Kline*, 513 U.S. 1032, 115 S.Ct. 613, 130 L.Ed.2d 522 (1994); *EP Medsystems, Inc. v. Echocath, Inc.*, 30 F.Supp.2d 726, 757 (D.N.J.1998); *Weikel v. Tower Semiconductor Ltd., et al.*, 183 F.R.D. 377, 387 (D.N.J.1998); *In re Prudential Insurance Co. of America Sales Practice Lit.*, 975 F.Supp. 584, 611–612 (D.N.J.1996).

■ Issues of individual reliance, however, do not automatically preclude class treatment, particularly in cases where a common course of deceptive conduct is alleged. *See In re Prudential Ins. Co.*, 148 F.3d 283, 310 (3d Cir.1998), *cert. denied*, 525 U.S. 1114, 119 S.Ct. 890, 142 L.Ed.2d 789 (1999) (sales presentations containing standardized, coordinated, and uniformly deceptive sales representations and omissions satisfy the predominance requirement).

For example, in *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718 (11th Cir.1987), plaintiffs moved for class certification based on complaints alleging defendants violated Section 10(b) and Rule 10b–5. *Id.* at 721. The plaintiffs specifically alleged defendants disseminated misleading prospectuses and engaged in a standardized promotional scheme regarding Petro–Lewis ("PL"), an oil and natural gas investment fund. *Id.* In addition, plaintiffs alleged defendants continued to sell and promote PL stock despite the awareness of defendants of the severe financial difficulties of PL. In support of class certification, the plaintiffs argued, *inter alia*, the allegations contained in the complaint involve a "common course of conduct toward all defendants, and thus any issues of individual reliance could not predominate over common questions of law or fact." *Id.* at 722 (citations omitted).

The District Court, however, refused class action treatment under the common course of conduct theory asserted by plaintiffs because the allegations "involve[d] primarily individualized oral representations rather than a common scheme . . . ." *Id.*

Upon review, the Eleventh Circuit determined the complaints alleged "defendants . . . engaged in a common course of conduct to misrepresent by affirmative acts and by omission the financial condition of PL." *Id.* at 725. The Eleventh Circuit found it dispositive that no evidence established the oral representations varied materially from the misleading information disseminated generally as a result of the common scheme employed by the defendants. *See id.* at 724. In addition, the Eleventh Circuit observed: "In view of the overwhelming number of common factual and legal issues presented . . . the mere presence of the factual issue of individual reliance could not render the claims unsuitable for class treatment." *Id.* at 724–25. *See also Gelb v. American Tel. & Tel. Co.*, 150 F.R.D. 76, 77–78 (S.D.N.Y.1993).

By contrast, and more akin to the instant action, if there is any material variation in the representations made or in the degrees of reliance thereupon, a fraud case may be unsuited for treatment as a class action. *See Broussard v. Meineke Discount Muffler Shops Inc.*, 155 F.3d 331, 341 (4th Cir.1998) (reliance must be applied with factual precision); *Castano v. American Tobacco Co.*, 84 F.3d 734, 745 (5th Cir.1996); *Mayer v. Mylod*, 988 F.2d 635, 640 (6th Cir.1993). *See also Kirkpatrick*, 827 F.2d at 724 (citing *Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 482 F.2d 880, 882 (5th Cir.1973)); *Seiler v. E.F. Hutton & Co., Inc.*, 102 F.R.D. 880, 888 (D.N.J.1984).

■ Generally stated, an action based substantially on oral, rather than written, misrepresentations cannot be maintained as a class action. *See Broussard*, 155 F.3d at 341; *Castano*, 84 F.3d at 745.

In *Broussard*, plaintiffs (franchisees) brought a class action against defendant (franchisor) alleging claims based on the misuse of funds paid by plaintiffs for advertising. *Broussard*, 155 F.3d at 331. Pursuant to each franchise agreement, every plaintiff was required to pay into a central account ten percent of weekly revenues to fund national and local advertising. *Id.* at 355. In return for the advertising contribution, the defendant was obligated to allocate the funds in the central account to direct advertising expenditures. *Id.* at 335.

The plaintiffs in *Broussard* instituted suit based on three alleged improper disbursements from the central account totaling approximately $32.2 million. *Id.* In support of the breach of fiduciary duty, fraud, and negligent misrepresentation claims, plaintiffs relied on 171 taped excerpts of statements made by representatives of the defendant during "final review sessions" that preceded the execution of any franchise agreement. *Id.* at 336.

In reversing the class certification by the District Court, the Fourth Circuit determined, *inter alia,* "plaintiffs built their breach of fiduciary duty, fraud, and negligent misrepresentation claims on the shifting evidentiary sands of individualized representations (the final review sessions) made to plaintiffs ...." *Id.* at 341. The Fourth Circuit also held that "the oral nature of the final review sessions makes them a particularly shaky basis for a class claim." *Id.* Finally, the Fourth Circuit held "the rights of these parties, arising as they do out of fraudulent representation which may vary widely between purchasers, are hardly suitable for class treatment." *Id.* (citing *Lukenas v. Bryce's Mountain Resort, Inc.,* 538 F.2d 594, 596 (4th Cir.1976)).

██ In the instant action, the unsuitable trading claim alleged by the Plaintiffs is similarly inappropriate for class treatment. As mentioned, proving a claim for unsuitable trading necessarily requires an individualized and fact intensive review of such factors as the investment objectives of the investor, the investment and/or financial experience of the investor, the nature of the alleged misrepresentation or omission by the broker, and the opportunity to detect the fraud. *See Banca Cremi,* 132 F.3d at 1027.

In support of the claim the securities purchased by Mullooly were unsuitable, Plaintiffs allege "at all times pertinent to this Complaint, [they] reposed complete trust in defendants to handle their accounts in accordance with [their] investment objectives

...." Complaint at ¶ 10. In addition, Plaintiffs assert "[b]efore opening [their accounts], Plaintiffs, as senior citizens, advised Mullooly that [their] experience in the area of securities investment was extremely limited, that Plaintiffs' investment objective was income and growth ... for the purpose of retirement ...." Complaint at ¶ 21. Plaintiffs also assert they wanted to insure their investment against the risk of losing the principal because the funds available for investment represented most of their life savings. *Id.*

Plaintiffs, however, have not alleged the Proposed Class similarly reposed complete trust in the Defendants to administer their accounts, or that the Proposed Class, as a whole, had extremely limited investing experience. In addition, Plaintiffs do not allege the investment objectives of the Proposed Class were similarly income and growth for the purpose of retirement. As well, and as significantly, Plaintiffs do not allege what the other members of the Proposed Class said to, or were told by, Mullooly when an account was opened for each member of the Proposed Class. In addition, the Plaintiffs fail to allege what each Proposed Class member said, did, or relied upon during the period in question.

The Plaintiffs, moreover, have not alleged the Defendants implemented a standardized misrepresentation or omission in connection with the alleged unsuitable trading of their account. Plaintiffs merely assert the Defendants, in an effort to attract business, placed an advertisement in local newspapers suggesting interested investors should contact Dean Witter.[25] *See* Complaint at ¶ 14, Exhibit C.

. In sum, Plaintiffs, like the franchisees in *Broussard,* have built their unsuitable trading claim on highly individualized facts, reliance, and oral representations, rather than predicating the claim on a standardized common course of conduct instituted by the Defendants. In addition, Plaintiffs have failed to establish the proposed class members

---

**25.** The advertisement provides in relevant part:
At Dean Witter we address retirement planning from only one point of view, Yours ....
No matter what you want to do when you retire, or where you want to do it, we'll develop a course of action based on your current situation to help get you there ....
Complaint, Exhibit C.

**414**

were involved in an investor-broker relationship similar to their own. The unsuitability claim asserted by Plaintiffs, therefore, is not appropriate for class treatment. *See Broussard,* 155 F.3d at 341.

### c. *UNAUTHORIZED TRADING*

■ Plaintiffs allege that over the course of fourteen months "Mullooly, without Plaintiffs' authorization, bought and sold securities in each Plaintiffs' account in excess of sixty transactions." Complaint at ¶¶ 10 & 41. Plaintiffs, moreover, allege that "on various occasions, [they] inquired of … Mullooly concerning the status of their accounts [and] Mullooly did not advise plaintiffs that transactions that had been made without authorization could be rejected …." Complaint at ¶ 43. In addition, Plaintiffs allege that "whether the Defendants were involved in failing to obtain client approval of transactions" is a legal and factual question common to all members of the Proposed Class. *See* Complaint at ¶ 15. It is not; a finding as to one member of the Proposed Class would not, by definition, be the same for all members of the Proposed Class.

The Defendants argue a cause of action for unauthorized trading is an extremely fact specific inquiry, "requiring Plaintiffs to individually prove that each allegedly unauthorized trade was in fact unauthorized (as well as establishing Defendants acted with scienter in each such instance)." Moving Brief at 11.

Unauthorized trading is not actionable without an accompanying misrepresentation, omission, or non-disclosure. *See generally Bald Eagle Area School Dist. v. Keystone Financial Inc., et al.,* 189 F.3d 321, 328 (3d Cir.1999) (knowing participation in ponzi scheme constituted securities fraud). *See also Crothers v. Commodity Futures Trading Commission,* 33 F.3d 405, 411 (4th Cir. 1994); *Meyers,* 1994 WL 362727 at *3; *Messer v. E.F. Hutton & Co.,* 833 F.2d 909, 916–17 (11th Cir.1987); *Manginelli v. Smith Barney, Inc., et al.,* 1999 WL 615096 (S.D.N.Y.12 Aug.1999); *Rivera v. Clark Melvin Sec. Corp.,* 59 F.Supp.2d 280, 292 (D.P.R.1999).[26]

In addition to specifying the disputed transactions and relevant omissions, a plaintiff must further plead the trades were "accompanied by an intent to defraud or a willful and reckless disregard of the client's best interests." *Messer,* 847 F.2d at 679 (citing *Brophy v. Redivo,* 725 F.2d 1218, 1221 (9th Cir.1984)). The fact a broker acted "intentionally" or "consciously," however, may not be sufficient to show scienter. *See Brophy,* 725 F.2d at 1221. Rather, a plaintiff must allege facts showing an intent to defraud.[27] *See id.*

In the instant action, it appears each class member will have to individually prove the allegedly unauthorized trades were not only unauthorized, but also conducted with the requisite intent to defraud. *See In re Ad-*

---

**26.** Some courts have held the failure of a broker to inform an investor of transactions made on his or her account is itself a material omission, and in fact, "no omission could be more material than that." *Village of Arlington Heights v. Poder,* 712 F.Supp. 680, 683 (N.D.Ill.1989)(quoting *Hometown Sav. & Loan Ass'n v. Moseley Sec. Corp.,* 703 F.Supp. 723, 724 (N.D.Ill.1988)).

But whether there was such a failure is unique to each member of the Proposed Class. Additionally, oral communications, conformations and/or the monthly individualized statements from the firm will probably raise factual issues emerging from notice of trades, and possible contentions by Defendants of approval and acquiescence to the trades, which Plaintiffs allege equate to fraud—all of which are unique to the particular investor.

**27.** In *Cruse,* the court held a showing of material omission or non-disclosure was sufficient to establish a claim for unauthorized trading. *Cruse,*

678 F.Supp. at 1028. In *Cruse,* the plaintiff alleged the account in question was a non-discretionary account and defendant traded securities for the account without first obtaining the requisite authority. *Id. See also Santa Fe Ind., Inc. v. Green,* 430 U.S. 462, 474–76, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). *But see Pross v. Baird, Patrick & Co., Inc.,* 585 F.Supp. 1456, 1460 (S.D.N.Y.1984).

In *Baird, Patrick,* plaintiff alleged defendants engaged in securities fraud by trading in a stock without disclosing thy were making a market in the stock. *Id.* at 1459. The District Court, however, determined "while conduct in which broker allegedly engaged was reprehensible (conducting trades in derogation of the account agreement), it did not involve the element of deception necessary to be violative of Rule 10b–5". *Id.* at 1460. In light of the absence of deception, the District Court concluded plaintiff, at most, had a claim for breach of fiduciary duty or breach of contract. *See id.*

*vanta Corp. Sec. Litig.*, 180 F.3d at 537 (securities fraud requires a showing of misrepresentation).

In support of the unauthorized trading claim, the Plaintiffs rely on conduct which is inherently individualized. For example, the Plaintiffs allege that during the described Class Period Mullooly, despite knowing the Plaintiffs lacked knowledge of the risks inherent in the purchase and sale of securities, conducted unauthorized transactions and failed to advise the Plaintiffs of the risks in those transactions. *See* Complaint at ¶ 45. The Plaintiffs, moreover, allege Mullooly acted fraudulently, intentionally, and with wanton and reckless disregard for their individual financial goals. *Id.* at ¶ 47. As mentioned, the Plaintiffs allege their specific investment goals were income and growth for retirement purposes. *See id.* at ¶ 10.

Because the instant action is predicated almost exclusively on alleged oral representations within the context of a personalized investor-broker relationship, it is likely those alleged non-standardized oral representations are subject to material variations. *See Amchem,* 521 U.S. at 624, 117 S.Ct. 2231. *Cf. In re Prudential Ins. Co.,* 148 F.3d at 310 (predominance requirement satisfied by identical oral and written misrepresentations in furtherance of a fraudulent scheme). In light of the predominance of individual issues, it appears the unauthorized trading claim asserted by the Plaintiffs is unsuited for class treatment. *See Amchem,* 521 U.S. at 624, 117 S.Ct. 2231.

### 2. *Rule 23(a)(1) NUMEROSITY*

Plaintiffs assert, upon information and belief, "the members of the [Proposed] Class are so numerous that joinder of all members is impracticable. The exact number of [Proposed] Class members is unknown to the Plaintiffs .... The Plaintiffs believe there are, at minimum, in excess of twenty members of the [Proposed] Class who were clients of the Defendants as a result of solicitations and senior citizen seminars conducted by [Mullooly]." Complaint at ¶ 14. In addition, Plaintiffs allege "[a] class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the [Proposed] Class is impracticable." *Id.* at ¶ 18.

In support of the Motion to Dismiss, Defendants argue "[a] putative class of [at minimum more than twenty members] is simply too small to justify class certification." Moving Brief at 12. Defendants also argue Rule 23(a)(1) "cannot be satisfied by conclusory allegations and broad speculation as to the number of potential class members." *Id.* (citations omitted). Finally, Defendants maintain "[t]here is no evidence that the putative class members are geographically dispersed thereby making joinder more difficult." *Id.* at 13

In order to satisfy the Rule 23(a) requirement of numerosity, a plaintiff must demonstrate the class is so "numerous that joinder of all parties is impracticable." Rule 23(a)(1). *See Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 119 S.Ct. 2295, 2305 n. 6, 144 L.Ed.2d 715 (1999); *Boucher v. Syracuse Univ., et al.,* 164 F.3d 113, 119 n. 11 (2d. Cir.1999); *Barnes v. American Tobacco Co.,* 161 F.3d 127, 140 n. 14 (3d Cir.1998); *In re Prudential Ins. Co.,* 148 F.3d at 309. "Impracticability does not mean impossibility, but rather that the difficulty or inconvenience of joining all members of the class calls for class certification." *Weikel,* 183 F.R.D. at 388 (quoting *Lerch v. Citizens First Bancorp, Inc.,* 144 F.R.D. 247, 250 (D.N.J.1992)); *see also Robidoux v. Celani,* 987 F.2d 931, 935 (2d Cir.1993).

"The number of potential class members is not, in and of itself, determinative of this question." *Mullen v. Treasure Chest Casino, LLC, et al.,* 186 F.3d 620, 624 (5th Cir.1999). *See* 1 *Newberg on Class Actions* § 3.05, at 3–25 (3d ed.1992) (suggesting that any class consisting of more than forty members "should raise a presumption that joinder is impracticable"). Rather, "[t]he numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations." *In re American Medical Systems, Inc.,* 75 F.3d 1069, 1079 (6th Cir. 1996) (quoting *General Tel. Co. Northwest v. Equal Employment Opportunity Comm'n,* 446 U.S. 318, 330, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980)).

Furthermore, "plaintiffs may further strengthen claims of joinder impracticability by asserting that the members of a proposed class are geographically scattered, thus creating practical difficulties in organizing a non-representative action." *Brosious v. Children's Place Retail Stores, et al.,* 189 F.R.D. 138, 145 (D.N.J.1999).

Although numbers alone are not usually determinative, a very small class may not meet the numerosity requirement because joinder of all members is practicable. *See Horizon Unlimited, Inc. v. Silva,* 1998 WL 238468, *3 (E.D.Pa. 12 May 1998). Joinder, moreover, is considered more practicable when all members of the class are from the same geographic area. *See Universal Calvary Church v. City of New York,* 177 F.R.D. 181, 183 (S.D.N.Y.1998) (concluding joinder would not be impracticable because putative class members lived in either Queens, Brooklyn, or Nassau County). *Cf. Mullen,* 186 F.3d at 624 (5th Cir.1999)(joinder impracticable where 100 to 150 class members were geographically dispersed). In addition, where class members can be easily identified, joinder is more likely to be practicable. *See Mullen,* 186 F.3d at 624.

■ In the instant action, the Plaintiffs have not established joining all members of its Proposed Class is so inconvenient or difficult that joinder is impracticable. Indeed, upon review of the Complaint, it appears joinder would be entirely practicable. *See* 1 *Newberg on Class Actions* § 3.05, at 3–25 (3d ed.1992); 3B J. Moore, *Moore's Federal Practice* ¶ 23.05[1], at 23–150 (2d ed.1982). For example, the Plaintiffs allege, "upon information and belief," the Proposed Class consists of "at minimum, in excess of twenty members . . . ." Complaint at ¶ 14. Plaintiffs, moreover, acknowledge the geographical composite of the Proposed Class encompasses only two adjoining counties located in central New Jersey. *Id.* at ¶ 13 & 14.

As mentioned, while the number of class members is not determinative of numerosity, *Mullen,* 186 F.3d at 624, it appears on the face of the Complaint the size of the Class, or lack thereof, cannot satisfy the Rule 23(a) numerosity requirement. *See e.g. In re Prudential Ins. Co.,* 148 F.3d at 309. In addition, the geographic centrality of the potential Class members indicates joinder would unquestionably be practicable. *See Universal Calvary Church v. City of New York,* 177 F.R.D. 181, 183 (S.D.N.Y.1998) (concluding joinder would not be impracticable because putative class members lived in either Queens, Brooklyn, or Nassau County), *cf. Mullen,* 186 F.3d at 624. (joinder impracticable because of geographical dispersion). It appears, therefore, the instant action does not meet the numerosity requirement set forth in Rule 23(a)(1).

## C. *ARBITRABILITY OF THE INSTANT ACTION*

At base, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he or [she] has not agreed so to submit." *Orlando v. Interstate Container Corp.,* 100 F.3d 296, 299 (3d Cir.1996) (citing *United Steelworkers of America v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)). *See also Bakery Drivers and Salesmen Local 194, IBT v. Harrison Baking Group* 869 F.Supp. 1168, 1175 (D.N.J.1994).

Accordingly, "whether or not [a party is] bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the Court on the basis of the contract entered into by the parties." *PaineWebber, Inc. v. Hofmann,* 984 F.2d 1372, 1376–77 (3d Cir.1993) (citing *Communications Workers of Am.,* 475 U.S. at 649, 106 S.Ct. 1415). *See also Harris v. Green Tree Financial Corp.,* 183 F.3d 173, 178–79 (3d Cir.1999); *Orlando,* 100 F.3d at 299.

■ In resolving the arbitrability of particular claims, however, "a court is not to rule on the potential merits of the underlying claims," no matter how frivolous the claims may appear to the court. *Hofmann,* 984 F.2d at 1376–77. *See also Harris,* 183 F.3d at 179. In addition, "there is a presumption of arbitrability in the sense that [a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be re-

solved in favor of coverage." *Hofmann*, 984 F.2d at 1376–77. *See also Communications Workers of Am.*, 475 U.S. at 650, 106 S.Ct. 1415; *Warrior & Gulf Navigation Co.*, 363 U.S. at 582–83, 80 S.Ct. 1347; *PaineWebber Inc. v. Hartmann*, 921 F.2d 507, 513 (3d Cir.1990).

## 1. *VALID ARBITRATION AGREEMENT*

■ The Federal Arbitration Act (the "FAA"), 9 U.S.C. § 1 *et seq.*, was enacted to "revers[e] centuries of judicial hostility to arbitration agreements" by "plac[ing] arbitration agreements upon the same footing as other contracts." *Harris*, 183 F.3d at 179. *See also Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110, 1113 (3d Cir.1993) (quoting *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 225–26, 107 S.Ct. 2332, 96 L.Ed.2d 185, (1987)). The FAA makes agreements to arbitrate enforceable to the same extent as other contracts. *Harris*, 183 F.3d at 179 (citing *Seus v. Nuveen & Co.*, 146 F.3d 175, 178 (3d Cir.1998)). Federal law presumptively favors the enforcement of arbitration agreements. *Id.* (citing *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 133 F.3d at 231).

■ The FAA applies to any maritime transaction or contract evidencing a transaction involving commerce. *See Reaseguros v. M/V Sky Reefer, et al.*, 515 U.S. 528, 538, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995)(citing *Allied–Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995)); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). *See also Harris*, 183 F.3d at 177 (because arbitration contracts are made pursuant to a transaction in inter-

state commerce, they shall be governed by the FAA).

■ In addition, transactions involving the purchase and/or sale of securities on national exchanges involve commerce for the purpose of the FAA. *See Rodriguez de Quijas, et al. v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989); *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*, 388 U.S. 395, 401 n. 7, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967).

■ Federal law, moreover, determines whether an issue governed by the FAA is referable to arbitration. *Harris*, 183 F.3d at 179. *See also Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 401–03, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967); *First Options of Chicago, Inc.*, 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 ("[A]rbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration."). Accordingly, a court must "engage in a limited review to ensure that the dispute is arbitrable." *Hartmann*, 921 F.2d at 511.

The Supreme Court has stated:

[T]here is a presumption of arbitrability in the sense that "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible to an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage."

*Communications Workers of Am.*, 475 U.S. at 650, 106 S.Ct. 1415 (quoting *Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–82, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)).[28]

Accordingly, a litigant can invoke the authority of a Federal court in order to force a reluctant party to arbitrate a dispute.[29] *See*

---

**28.** In this regard,

Questions of arbitrability must be addressed with a healthy regard for the [F]ederal policy favoring arbitration .... The [FAA] establishes that, as a matter of [F]ederal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration ....

*Mutual Benefit Life Ins. Co. v. Zimmerman*, 783 F.Supp. 853, 868 (D.N.J.1992). *See also Communications Workers of Amer.*, 475 U.S. at 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986).

**29.** The FAA, in particular Section 4, embodies the well established policy favoring the arbitration of disputes. "The [FAA] establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration ...." *Mastrobuono v. Shearson Lehman Hutton, Inc., et al.*, 514 U.S. 52, 61 n. 8, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995)(quoting *Moses H. Cone Mem. Hospital*, 460 U.S. at 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)); *McMahon*, 482 U.S. 220, 107 S.Ct.

FAA, 9 U.S.C. § 4 ("Section 4").[30] *See also Mastrobuono*, 514 U.S. at 61 n. 8, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995); *Moses H. Cone Mem. Hospital*, 460 U.S. at 25 n. 32, 103 S.Ct. 927; *Prudential–Bache Securities, Inc., et al. v. Fitch*, 966 F.2d 981, 987 (5th Cir. 1992); *Hartmann*, 921 F.2d at 510.

 In the instant action, it is undisputed the Plaintiffs entered into the Account Agreements for security brokerage services with Defendants. *See* Complaint at ¶ 10. Because the Account Agreements pertain exclusively to the purchase and sale of various securities, the Account Agreements are properly governed by the FAA. *See Rodriguez de Quijas*, 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). In addition, by signing the Account Agreements, Plaintiffs explicitly "acknowledge[d] [they] received the Dean Witter Client Agreement and agree[d] to abide by its terms as currently in effect . . . ." *See* Mullooly Declaration, Exhibits 1 & 2.

The Client Agreements, in turn, set forth an arbitration of controversies clause (the "ACC"), in which an investor agrees "that all controversies between [investor] or [investor's] principals or agents and Dean Witter or its agents . . . arising out of or concerning any of [the investor's] accounts, order or transactions, or the construction, performance, or breach of this or any other agreement . . . shall be determined by arbitration . . . ." *Id.* Because the churning, unsuitability, and unauthorized trading claims asserted by the Plaintiffs necessarily "arise out of, and concern," the accounts of the Plaintiffs and the alleged breach of a fiduciary duty by Defendants, it appears the instant "controversies" fall within the broad scope of the ACC as defined in the Client Agreements. *Harris*, 183 F.3d at 179.[31]

## 2. STAY OF THE COURT PROCEEDINGS

"If a party to a binding arbitration agreement is sued in [F]ederal court on a claim that the plaintiff has agreed to arbitrate, [that party] is entitled under the FAA to a stay of the court proceeding. . . . If all of the claims involved in an action are arbitrable, a court may dismiss the action instead of staying it." *Seus*, 146 F.3d at 178 (3d Cir.1998) (citing *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir.1992); *Dancu v. Coopers & Lybrand*, 778 F.Supp. 832, 835 (E.D.Pa.1991), *aff'd*, 972 F.2d 1330 (3d Cir. 1992)).

Accordingly, pursuant to the FAA, 9 U.S.C. § 3 ("Section 3"),[32] a district court "must stay proceedings if satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding." *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 74 (2d Cir.1997) (quoting

2332, 96 L.Ed.2d 185 (1987)(we rigorously enforce agreements to arbitrate).

30. Section 4 of the FAA provides in relevant part:
A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.
9 U.S.C. § 4.

31. The Plaintiffs allege Mullooly "advised, encouraged and persuaded [P]laintiffs to sign signature pages of several documents . . . . Plaintiffs never saw any portion of these documents other than the signature page." Complaint at ¶ 22. The Plaintiffs, however, make no reference to, much more argue they were unaware of, the meaning or import of the "several documents" in their Opposition Brief.

By contrast, the following language appears directly above the signature of each Plaintiff on their Account Agreement:
I acknowledge I have received the Dean Witter Client Agreement and agree to abide by its terms as currently in effect or as they may be amended from time to time.
*See* Mullooly Certification, Exhibits 1 & 2.

32. Section 3 provides:
If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the application for the stay is not in default in proceeding with such arbitration.
9 U.S.C. § 3.

*McMahan Securities Co. L.P. v. Forum Capital Markets L.P.,* 35 F.3d 82, 85 (2d Cir. 1994)). *See also Harris,* 183 F.3d at 179.

Section 3, therefore, "leaves no place for the exercise of discretion by a[D]istrict [C]ourt, but instead mandates that [D]istrict [C]ourts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *WorldCrisa Corp.,* 129 F.3d at 74 (quoting *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 218, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985)).

As mentioned, the Plaintiffs, upon signing the Account Agreements, agreed to submit "all controversies arising out of or concerning any of [their] accounts, order or transactions, or the construction, performance, or breach of this or any other agreement" to arbitration. *See* Mullooly Declaration, Exhibits 1 & 2. The churning, unsuitable trading and unauthorized trading claims, moreover, fall within the purview of the ACC contained in the Client Agreements. Accordingly, because the claims underlying the instant action are subject to a valid written agreement to arbitrate, the instant action must be stayed pending the outcome of the arbitration. *See Byrd,* 470 U.S. at 218, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985); *Armstrong,* 129 F.3d at 74. The instant action, therefore, is administratively terminated pending the resolution of the arbitration claims. The parties shall have the right to re-open, if appropriate, any issues remaining after arbitration is complete.

### D. *Conclusion*

For the foregoing reasons, the Motion to dismiss the class action allegations of the Complaint, compel arbitration of the underlying issues in the Complaint, and stay the individual claims of the Plaintiffs in the instant action pending the outcome of arbitration is granted.