RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 07a0153p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

THE ROBERT N. CLEMENS TRUST, et al.,
                              *Plaintiffs-Appellants,*

         *v.*

MORGAN STANLEY DW, INC.,
                              *Defendant-Appellee.*

No. 06-5525

---

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 04-02384—Bernice B. Donald, District Judge.

Argued: January 30, 2007

Decided and Filed: May 2, 2007

Before: NORRIS, COLE, and CLAY, Circuit Judges.

---

## COUNSEL

**ARGUED:** H. Naill Falls, FALLS & VEACH, Nashville, Tennessee, for Appellants. Richard A. Rosen, PAUL, WEISS, RIFKIND, WHARTON & GARRISON, New York, New York, for Appellee. **ON BRIEF:** H. Naill Falls, FALLS & VEACH, Nashville, Tennessee, for Appellants. Richard A. Rosen, PAUL, WEISS, RIFKIND, WHARTON & GARRISON, New York, New York, for Appellee.

---

## OPINION

---

R. GUY COLE, JR., Circuit Judge. The Robert N. Clemens Trust, Automobile Consumer Service Corporation, John D. Brandon, Jr., Pat F. Wakefield, and Marty D. Jackson (collectively the "Plaintiffs") brought this class-action suit against Morgan Stanley DW, Inc. ("Morgan Stanley"). Plaintiffs allege that Morgan Stanley's brokers recommended to Plaintiffs the purchase of unsuitable securities in violation of Section 10(b) of the Securities and Exchange Act of 1934, codified at 15 U.S.C. § 78j, and Rule 10b-5, codified at 17 C.F.R. § 240.10b-5. The Plaintiffs also brought state-law claims against Morgan Stanley under Tenn. Code Ann. § 48-2-121(a), which parallels the language in Rule 10b-5, and Ala. Code § 8-6-19. The district court granted Morgan Stanley's motion, under Rule 12(b)(6), to dismiss Plaintiffs' complaint. For the following reasons, we **AFFIRM** the district court's dismissal of Plaintiffs' suit.

## I. BACKGROUND

Plaintiffs brought this class-action suit on behalf of individuals and entities who, at the recommendation of a Morgan Stanley broker, purchased $50,000 or more of Class B shares in one or more of Morgan Stanley's mutual funds.[1] For purposes of reviewing the district court's grant of Morgan Stanley's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), we accept as true the Plaintiffs' allegations. Therefore, the following facts are taken from the complaint:

> Morgan Stanley, and its affiliates, market[] more than sixty mutual equity and bond mutual funds to investors throughout the United States. Compl. ¶ 15. The Morgan Stanley Funds, which invest in stocks, bonds, and other classes of assets and offer a wide range of investment strategies, are marketed to the public as a "family of mutual funds." *Id.* ¶ 19. The great majority of Morgan Stanley Fund shares are marketed and sold to investors who have brokerage accounts with Morgan Stanley. *Id.* ¶ 24.

> Morgan Stanley Funds are offered in different share classes, designated as A, B, C and other share classes. *Id.* ¶ 25. The share classes for a given fund represent claims on the same underlying portfolio of investments, but differ in their expense structures. *Id.* Expenses for the share classes are differentiated with respect to the amount and timing of one-time charges, referred to as "loads," and annual fees for asset management, marketing, sales ("distribution"), and other services. *Id.* ¶ 26.

> For Class A shares in equity funds, Morgan Stanley typically charges what is referred to as a "front-end load" in the amount of 5.25% for investments of less than $25,000, which is paid at the time of the initial investment. *Id.* ¶ 27. In addition, Class A shares are charged an annual distribution fee of 0.25% as well as other fees and expenses. *Id.* The front-end load is reduced incrementally for investments of $25,000 or more. *Id.* For example, the front-end load for an investment of $25,000 to $49,999 is reduced to 4.75% of the investment. *Id.* The front-end load is further reduced at investment levels of $50,000, $100,000, $250,000, and $500[,000]. *Id.* The front-end load for Class A shares is eliminated altogether for investments of $1 million and over. *Id.*

---

[1]Specifically, the class of plaintiffs is comprised of three categories of investors:

(1) "a class consisting of non-retirement account investors who, individually or together with other persons or entities with respect to which Morgan Stanley permits combined purchasing for purposes of front-end load calculation, purchased, at the recommendation of [Morgan Stanley], in a single or combined transaction, $50,000 or more of Class B shares in one or more Morgan Stanley mutual funds during the period February 25, 1998 and thereafter"; (2) "a class consisting of all retirement account investors who (i) individually or together with other persons or entities with respect to which Morgan Stanley permits combined purchasing for purposes of front-end load calculation, purchased, at the recommendation of [Morgan Stanley], in a single or combined transaction, $50,000 or more of Class B shares in one or more Morgan Stanley mutual funds during the period February 25, 1998 and thereafter, and (ii) were less than 54 years of age at the time the purchase(s) giving rise to class status were made"; and (3) "a class consisting of all retirement account investors who (i) individually or together with other persons or entities with respect to which Morgan Stanley permits combined purchasing for purposes of front-end load calculation, purchased, at the recommendation of [Morgan Stanley], in a single or combined transaction, $100,000 or more of Class B shares in one or more Morgan Stanley mutual funds during the period February 25, 1998 and thereafter, and (ii) made no withdrawals in the twelve months following the purchase(s) giving rise to class status."

(Joint Appendix ("JA") 19-20, Compl. ¶ 47.)

The reduced sales charge is applicable to purchases of Class A shares in a single transaction. *Id.* ¶ 28. The reduced sales charge is also available (1) for combined purchases of Class A shares in different Morgan Stanley Funds, (2) under rights of accumulation, (3) when the investor enters into a Letter of Intent, and (4) under a number of other different scenarios relating to retirement planning. *Id.* ¶ 29.

Morgan Stanley offers Class B shares with no initial sales charge, but the Class B shares are subject to a contingent deferred sales charge (CDSC), also known as back-end load, ranging from 5% in the first year the shares are held to 1% in the sixth year. *Id.* ¶ 30. There is no CDSC for Class B shares held more than six years. *Id.* Morgan Stanley states that it normally charges Class B shareholders of equity funds an annual distribution fee of 1%, which is .75% more than Class A shares, as well as the same other fees and expenses charged to Class A funds. *Id.* ¶ 31.

In order to determine which share class is best for a particular investment strategy or investment amount, one must examine the fees and expenses associated with each share class during the period of time the investor may hold the investment. *Id.* ¶ 33. As [Morgan Stanley] knows, such an analysis is beyond the ability of the vast majority of mutual fund investors. *Id.*

With a $50,000 investment in Class A, investors pay a smaller front-end load than with smaller investments. *Id.* ¶ 34. With respect to almost any possible holding period, an investor is better off investing $50,000 or more in Class A shares rather than Class B shares. *Id.* Because of the greater reduction in the Class A front-end load for investors [who invest between $100,000 and $249,000], a Class A investment is even more clearly superior to a Class B investment. *Id.* ¶ 35.

Defendant recommends and sells Class B shares to individuals and entities investing $50,000 or more in Morgan Stanley funds, even though defendant knows that Class B investors will pay more fees and earn less profit than if they had chosen Class A shares. *Id.* ¶ 37. A stockbroker who recommends an investment to a client has a legal obligation to recommend only suitable investments. *Id.* ¶ 38. [Morgan Stanley] and its agents have consistently violated this duty in recommending the purchase of Morgan Stanley mutual funds in amounts of $50,000 or more. *Id.* In addition, by recommending that [Plaintiffs] purchase Class B shares in such amounts, [Morgan Stanley] and its agents impliedly represented to [Plaintiffs] that such an investment was suitable for them. *Id.* This representation was false. *Id.*

(JA 9-28.) Morgan Stanley's bond funds perform in the same manner as the equity funds discussed above. Plaintiffs invested in both equity and bond funds.

On March 8, 2006, the district court granted Morgan Stanley's motion to dismiss Plaintiffs' federal-law claims because Plaintiffs failed to state a cause of action under the heightened pleading requirement for Section 10(b) and Rule 10b-5. *Robert N. Clemens Trust v. Morgan Stanley DW, Inc.*, No. 04-2384, slip op. (W.D. Tenn. Mar. 8, 2006). In granting Morgan Stanley's motion to dismiss, the district court reached the following conclusions: (1) Plaintiffs failed to state specific factual allegations that Morgan Stanley "or its agents knew or were reckless in not knowing that Class B was inferior to Class A shares"; (2) Plaintiffs failed to state sufficient facts to "allow the Court to draw an inference that [Morgan Stanley] knew that Class B was inferior to Class A" shares and thus the "most likely inference is that Morgan Stanley sought to offer diverse funds to its clients"; and (3) Plaintiffs failed to state specific facts to establish that Morgan Stanley's brokers "knew that Class B was unsuitable for investors." *Clemens Trust*, slip op. at 6-7. The district court

also declined to exercise supplemental jurisdiction over Plaintiffs' state-law claims. Plaintiffs timely appealed.

## II.  DISCUSSION

We review de novo the district court's grant of Morgan Stanley's Rule 12(b)(6) motion to dismiss. *McCarthy v. Middle Tenn. Elec. Membership Corp.*, 466 F.3d 399, 405 (6th Cir. 2006). "In reviewing a Rule 12(b)(6) motion to dismiss, [we] treat all well-pleaded allegations in the complaint as true, and dismissal is proper only if it appears beyond doubt that the plaintiff can prove no set of facts in support of the claims that would entitle him or her to relief." *Downie v. City of Middleburg Heights*, 301 F.3d 688, 693 (6th Cir. 2002) (quoting *Pfennig v. Household Credit Servs., Inc.*, 286 F.3d 340, 343 (6th Cir. 2002) (internal quotation marks omitted)). We must also "construe the complaint in the light most favorable to the plaintiffs." *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). Further, we are not confined to the grounds relied on by the district court in affirming the court's dismissal; rather, we may affirm the district court's dismissal of Plaintiffs' claims on any grounds, even those not relied on by the district court. *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 548-49 (6th Cir. 1999) (explaining that "a federal court of appeals is not restricted to ruling on the district court's reasoning, and may affirm a district court's grant of a motion to dismiss on a basis not mentioned in the district court's opinion").

As an initial matter, we address whether we have jurisdiction to hear this appeal in light of the district court's order which clearly states that Plaintiffs' claims are dismissed without prejudice. *See Clemens Trust*, slip op. at 10.   However, after the district court issued its order, the court also issued a final judgment dismissing all of Plaintiffs' claims.

A federal court must satisfy itself that it has subject-matter jurisdiction over a case. *United States v. Yeager*, 303 F.3d 661, 664 (6th Cir. 2002) ("A court of appeals independently evaluates its appellate jurisdiction over cases."). Under 28 U.S.C. § 1291, we have jurisdiction over "final decisions of the district courts of the United States." We have explained that "[f]or a dismissal without prejudice to be inherently final, it must, as a practical matter, prevent the parties from further litigating the merits of the case in federal court." *Yeager*, 303 F.3d at 665. In *Sanford v. Motts*, 258 F.3d 1117, 1119 (9th Cir. 2001), the Ninth Circuit explained that "[w]here the district court dismisses an *action* without prejudice, . . . the order is final and appealable. *Accord Thompson v. Mich. Dep't of Corr.*, 23 Fed. App'x. 486, 487-88 (6th Cir. Dec. 3, 2001) (explaining that a dismissal of a complaint, as opposed to an action, without prejudice is not a final and appealable order).

Here, the district court must have intended to dismiss the Plaintiffs' claims with prejudice because if not, the court would not have entered a final judgment; rather the court would have given the Plaintiffs an opportunity to amend and re-file their complaint. *See Thomas v. Kalu*, No. 06-3816, 2007 WL 648312, at *2 (7th Cir. Feb. 26, 2007) ("[W]e consider the judgment final because the district court showed that it was finished with the case by dismissing the entire action.") (internal quotation marks omitted). Alternatively, by not attempting to amend their complaint or objecting to the district court's issuance of a judgment, the Plaintiffs must have intended to "stand" on the dismissed complaint. *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 172 (3d Cir. 2000) (noting that "a dismissal without prejudice is not a final and appealable order under § 1291, unless the plaintiff can no longer amend the complaint or unless the plaintiff declares an intention to stand on the complaint as dismissed"). Thus, we have subject-matter jurisdiction over Plaintiffs' appeal.

## A.  The Pleading Standard under Section 10(b) and Rule 10b-5

Section 10(b) of the Securities and Exchange Act of 1934 (the "Act") and Rule 10b-5 "prohibit fraudulent, material misstatements or omissions in connection with the sale or purchase

of a security." *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 680-81 (6th Cir. 2004) (quoting *Morse v. McWhorter*, 290 F.3d 795, 798 (6th Cir. 2002)). Section 10(b) provides, in relevant part, as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange–
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j (2000). Further, Rule 10b-5, promulgated by the Securities and Exchange Commission ("SEC") under Section 10(b), provides, in relevant part, as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. A valid claim under Section 10(b) of the Act and Rule 10b-5 "must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury." *In re Comshare*, 183 F.3d at 548; *PR Diamonds*, 364 F.3d at 681.

Prior to 1995, a plaintiff bringing a fraud action had to plead fraud "with particularity" as required by Federal Rule of Civil Procedure 9(b). In 1995, Congress amended the Act through the passage of the Private Securities Litigation Reform Act (the "PSLRA"), codified at 15 U.S.C. §§ 78u–4 & –5 (1998). The PSLRA heightened the standard for pleading scienter in a securities-fraud case:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, *state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.*

15 U.S.C. § 78u–4(b)(2) (1998) (emphasis added).

The Seventh Circuit explained that the purpose for the heightened pleading requirement in fraud cases was "to force the plaintiff to do more than the usual investigation before filing his complaint." *Ackerman v. Nw. Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999). The *Ackerman* court noted that "[g]reater precomplaint investigation is warranted in fraud cases because public

charges of fraud can do great harm to the reputation of a business firm or other enterprise (or individual)." *Id.* Therefore, the added pre-complaint investigation assures the court "that the charge of fraud is responsible and supported, rather than defamatory and extortionate." *Id.* at 469-70. The PSLRA, however, did not alter the scienter standard. *See In re Comshare*, 183 F.3d at 548-49 ("The PSLRA did not change the scienter that a plaintiff must prove to prevail in a securities fraud case but instead changed what a plaintiff must plead in his complaint in order to survive a motion to dismiss."). Thus, "[t]o establish a defendant's liability under § 10(b), a plaintiff must, as a threshold matter, allege in his complaint that the defendant acted with sufficient scienter." *Id.* at 548.

In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976), the Supreme Court defined scienter as "a mental state embracing intent to deceive, manipulate, or defraud." The Court in *Ernst* did not address "whether, in some circumstances, reckless behavior is sufficient for civil liability under Section 10(b) and Rule 10b-5." *Id.* Nonetheless, we have "long premised liability on at least reckless behavior." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 548 (6th Cir. 2001) (en banc) (quoting *Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1025 (6th Cir. 1979)). In *Mansbach*, we defined recklessness as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it." 598 F.2d at 1025. We explained that recklessness, as a mental state, "falls somewhere between intent and negligence." *Id.* at 1025 n.36 (citing *Sanders v. John Nuveen & Co., Inc.*, 554 F.2d 790, 793 (7th Cir. 1977)).

In *Helwig*, we elaborated on the Plaintiffs' burden of pleading facts in the complaint that allege a strong inference of recklessness:

> As always under Rule 12(b)(6), we will indulge plaintiffs' inferences of fraud—provided, of course, those inferences leave little room for doubt as to misconduct. Inferences must be reasonable and strong—but not irrefutable. Strong inferences nonetheless involve deductive reasoning; their strength depends on how closely a conclusion of misconduct follows from a plaintiff's proposition of fact. Plaintiffs need not foreclose all other characterizations of fact, as the task of weighing contrary accounts is reserved for the fact finder. Rather, the strong inference requirement means that *plaintiffs are entitled only to the most plausible of competing inferences*.

251 F.3d at 553 (internal quotation marks omitted) (emphasis added). Further, in *In re Comshare*, we explained that a plaintiff who pleads only motive and opportunity to commit securities fraud does not satisfy the scienter requirement of a Section 10(b) and Rule 10b-5 action: "[P]laintiffs may plead scienter . . . by alleging facts giving rise to a strong inference of recklessness, but not by alleging facts merely establishing that a defendant had the motive and opportunity to commit securities fraud." 183 F.3d at 549; *see also PR Diamonds*, 364 F.3d at 689 (discussing how pleading motive and opportunity alone does not establish scienter for liability under Section 10(b) and Rule 10b-5). Nonetheless, "facts regarding motive and opportunity may be 'relevant to pleading circumstances from which a strong inference of fraudulent scienter may be inferred' and may, on occasion, rise to the level of creating a strong inference of reckless or knowing conduct." *In re Comshare*, 183 F.3d at 551 (quoting *In re Baesa Sec. Litig.*, 969 F. Supp. 238, 242 (S.D.N.Y. 1997)); *see also Helwig*, 251 F.3d at 550 ("While it is true that motive and opportunity are not substitutes for a showing of recklessness, they can be catalysts to fraud and so serve as external markers to the required state of mind.").

In *Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1031 (2d Cir. 1993), a case also dealing with the purchase of unsuitable securities, the Second Circuit stated that "[s]cienter may be inferred by finding that the defendant knew or reasonably believed that the securities were unsuited to the investor's needs, misrepresented or failed to disclose the unsuitability of the securities, and

proceeded to recommend or purchase the securities anyway." Lastly, in *PR Diamonds*, we explained that, in determining whether the complaint raises a strong inference of scienter, "[we] employ[] a totality of the circumstances analysis whereby the facts argued *collectively* must give rise to a strong inference of at least recklessness." 364 F.3d at 683 (explaining that the plaintiffs' allegations should not be examined in a piecemeal fashion) (emphasis added).

Plaintiffs' claim is based on an unsuitability argument, namely, that Morgan Stanley, by recommending Class B shares, knowingly sold Plaintiffs unsuitable securities. (JA 17, Compl. ¶38.) A suitability claim is a type of section 10(b) fraud claim. *See Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017, 1032 (4th Cir. 1997) ("A claim for § 10(b) suitability fraud is a subset of the ordinary § 10(b) fraud claim.") (quoting *Brown*, 991 F.2d at 1031 (internal quotation marks omitted)).

## B. Plaintiffs Did Not Plead Facts Giving Rise To A Strong Inference Of Recklessness By Morgan Stanley

The district court concluded that Plaintiffs failed to "make any specific factual allegations that Defendant or its agents knew or were reckless in not knowing that Class B was inferior to Class A." *Clemens Trust*, slip op. at 6. The district court was persuaded that Plaintiffs did not plead a strong inference of recklessness because, although Class B shares generated more income for Morgan Stanley, because of the fees associated with Class B, Morgan Stanley also offered Class A shares for investors to purchase. *Id.* at 7. "Against this backdrop, it is difficult for the Court to infer that Morgan Stanley had the intent to 'manipulate, deceive or defraud' when Defendant could have legitimately offered only one class, Class B, and presumably receive[d] the larger expense revenue that it offered instead of the lesser revenue generated by Class A." *Id.* The district court concluded that the most likely inference was not one of recklessness but rather that Morgan Stanley "legitimately sought to diversify its offerings and not to manipulate its clients." *Id.*

Plaintiffs argue that they met their burden under the PSLRA because they alleged the following facts in the complaint: "(i) who made the recommendations at issue . . . (the [Morgan Stanley] broker of record who handled each plaintiff's account), (ii) what was recommended (Class B shares in certain specific amounts), (iii) why the recommendations were unsuitable (they would lead to unnecessary and unreasonable fees), and (iv) when the transactions at issue occurred." (Appellant's Reply Br. 14.) Further, Plaintiffs argue that the district court erred in concluding that a suitability determination requires a consideration of factors other than cost: "In determining which share class is suitable for a particular investor, expenses are the only relevant factor." (Appellant's Br. 22.) In short, Plaintiffs assert that for the putative class, the purchase of Class B shares was always an inferior investment option when compared to Class A shares, regardless of investment objective or holding period. (Appellant's Reply Br. 7.) Plaintiffs excluded from the class all individuals for whom Class B shares might have been a suitable investment.

Conversely, Morgan Stanley argues that Plaintiffs "cannot adequately plead scienter by contending that Morgan Stanley's brokers were motivated by the prospect of earning higher fees." (Appellee's Br. 38.) The crux of Morgan Stanley's argument is that "suitability determinations are based on the information an investor supplies his broker about, among other things, his financial situation and investment objectives," and therefore Plaintiffs' failure to plead the contents of each plaintiff's communications with his or her broker is fatal to their suitability claim. (*Id.* 29.) Morgan Stanley states that the "complaint pleads no facts concerning any investors' actual investment goals or intentions, nor the substance of the questions the brokers asked and the answers received." (*Id.* 30.) "The real question is whether, at the time of the original recommendation of B shares, it was reasonable to take into account the availability of . . . [features specific to Class B] and the fact that the client might later wish to take advantage of [such] . . . feature[s]." (*Id.* 31.)

The Tenth Circuit, in *O'Connor v. R.F. Lafferty & Co.*, 965 F.2d 893, 898 n.6 (10th Cir. 1992), explained that "[u]nsuitability can be found where the investor proves the broker knew or reasonably believed the recommended securities were unsuitable but recommended them anyway." A determination as to the suitability of an investment is made after considering the investor's investment objectives and needs because an investment is unsuitable for an investor if what the broker recommends contradicts the investment goals communicated to the broker by the investor. *See, e.g.*, *Brown*, 991 F.2d at 1031. In *Department of Enforcement v. Respondent 1*, 2005 NASD Discip. LEXIS 17, at *30 (Mar. 15, 2005), a hearing panel of the National Association of Securities Dealers ("NASD") rejected a similar claim to the one Plaintiffs assert here: "The Panel . . . rejects the notion that Respondent 1 was, in essence, required to formulate his recommendation based on a single factor — costs." The decision goes on to explain that "[t]ailoring recommendations for individual investors requires more than a mechanical comparison of costs; in making a recommendation, a [broker] must take into account a variety of factors that bear upon whether a particular investment is suitable for a specific investor." *Id.* Thus, in an individual action asserting an unsuitability claim, a plaintiff would ordinarily satisfy the PSLRA pleading requirement by alleging facts regarding his or her investment objectives at the time of investment, that those objectives were communicated to the broker, and that the broker nonetheless recommended securities that did not further those investment goals. *See Louros v. Kreicas*, 367 F. Supp. 2d 572, 587 (S.D.N.Y. 2005) (explaining that an unsuitability claim "requires (a) proof of the knowing purchase or recommendation of unsuitable securities, and (b) that the misrepresentations and omissions in question relate to the suitability of the securities").

Plaintiffs, however, could not have pleaded the individualized investment objectives of each investor, as Morgan Stanley insists they must in order to survive dismissal, because doing so would likely have defeated class certification. *See, e.g.*, *Coleman v. Gen. Motors Acceptance Corp.*, 296 F.3d 443, 446 (6th Cir. 2002) (explaining that Rule 23(b)(3) requires that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members") (quoting Fed. R. Civ. P. 23(b)(3) (internal quotation marks omitted)). In *Rowe v. Morgan Stanley Dean Witter*, No. 98-5764, 1999 U.S. Dist. LEXIS 21746 (D.N.J. Dec. 20, 1999), for instance, the plaintiffs filed a class-action suit against Morgan Stanley, claiming that Morgan Stanley engaged in unsuitable trading of securities for the plaintiffs' accounts. The district court concluded that the plaintiffs' claim was unsuitable for class treatment because the plaintiffs "have not alleged [that] Defendants implemented a standardized misrepresentation or omission in connection with the alleged unsuitable trading of their account." *Id.* at *51. Specifically, the court noted that the plaintiffs "have built their unsuitable trading claim on highly individualized facts, reliance, and oral representations, rather than predicating the claim on a standardized common course of conduct instituted by the Defendants." *Id.* at *52. Thus, requiring Plaintiffs to plead each investor's individualized investment objectives would ensure that plaintiff-specific factual issues (i.e., what each investors' investment objectives were, whether those objectives were communicated to the broker, and whether the recommended securities contradicted those objectives) would predominate, precluding Plaintiffs from obtaining class certification. *See* Fed. R. Civ. P. 23(b)(3). Morgan Stanley, however, does not argue that an unsuitability claim can never be brought as a class action, nor do we find any authority to support such a proposition.

Accordingly, to satisfy the pleading requirements of the PSLRA and still be able to pursue their claims as a class, Plaintiffs should have pleaded facts demonstrating that Morgan Stanley engaged in a *scheme to defraud* its investors. *See, e.g.*, *Rowe*, 1999 U.S. Dist. LEXIS 21746, at *51 (explaining that "Plaintiffs . . . have not alleged the Defendants implemented a standardized misrepresentation or omission in connection with the alleged unsuitable trading"). Plaintiffs' complaint must allege facts indicating that Morgan Stanley was steering all investors or a predetermined number of investors into investments in Class B shares, regardless of each investor's personal investment goals or what each investor told their broker. This would allow Plaintiffs to satisfy the PSLRA pleading requirement without having to plead each investor's individual

investment objectives, because if Morgan Stanley were engaged in a fraudulent scheme, its brokers would recommend Class B shares to all investors despite each investor's specific needs. Plaintiffs, however, did not plead facts establishing such a scheme.

Plaintiffs complaint makes the following relevant allegations: (1) "[A]n investment of $50,000 or more in Morgan Stanley's Class B shares represents an inferior investment choice for any rational investment strategy because such an investor in Class B shares will end up paying more fees to Morgan Stanley than if the investor had selected Class A"; (2) Morgan Stanley "consistently recommend[s] that clients invest $50,000 or more" in Class B shares because of the higher fees generated for the brokers; (3) "[i]n recommending and selling Class B mutual fund shares to plaintiffs and others in amounts of $50,000 or more, [Morgan Stanley] . . . has engaged in a course of business which operated as a fraud and deceit on mutual fund investors"; and (4) Morgan Stanley "recommends and sells Class B shares . . . even though defendant knows that Class B investors will pay more fees and earn less profit than if they had chosen Class A shares." (JA 10-11, Compl. ¶ 4-6; JA 16-17, Compl. ¶ 34, 37-38.)

In *Bischoff*, the court explained that "a naked conclusory allegation is not sufficient to state a claim for securities fraud." 687 F. Supp. at 752-53. Here, Plaintiffs have made conclusory allegations that Morgan Stanley participated in a fraudulent scheme when its brokers recommended Class B shares, without alleging facts to support the existence of such a scheme. In contrast, in *In re Salomon Analyst Level 3 Litigation*, 350 F. Supp. 2d 477 (S.D.N.Y. 2004), investors brought a class-action suit, alleging that Citigroup; Salomon Smith Barney ("SSB"), its investment banking division; and Jack Grubman, its research analyst, engaged in a scheme to defraud purchasers and sellers of stock in certain telecommunications companies. Plaintiffs asserted claims against Grubman and SSB for violations of Section 10(b) and Rule 10b-5, alleging material misstatements and omissions concerning both the ratings and reports on certain telecommunications companies.

Plaintiffs pleaded numerous examples of ways in which SSB influenced its analysts' ratings: (1) analysts were given a "scorecard . . . that listed the investment banking fees earned from companies in that analyst's coverage sector"; (2) analysts were paid extra fees "based on the amount of investment banking fees earned from transactions involving companies covered by that analyst"; (3) analysts were pressured by the investment banking division "to tailor their coverage to avoid angering companies that SSB was pursuing for lucrative investment banking business"; (4) analysts were required to "detail their contributions to investment banking transactions as part of determining the analyst's annual compensation"; (5) SSB executives encouraged a close-relationship between the research analyst division and the investment banking division and "describ[ed] analysts as 'the key element in banking success'"; (6) analysts attended training seminars that "instructed analysts on how using more conservative assumptions in their financial modeling could relieve the short-term pressure on covered companies to meet Wall Street's projections"; and (7) "[t]he overall message at these seminars was for analysts to see themselves as 'partners' with the investment banking division of SSB." *Id.* at 482. Here, Plaintiffs have not alleged sufficient facts indicating that Morgan Stanley was encouraging its brokers to recommend Class B shares to investors regardless of their investment objectives.

Further, Plaintiffs' allegation that Morgan Stanley's brokers recommended Class B shares for investors with investments of $50,000 or greater because of the lucrative compensation structure is also not sufficient to establish the existence of a fraudulent scheme because it amounts to no more than pleading a motive and opportunity for Morgan Stanley to commit securities fraud. Such allegations alone are insufficient. *See, e.g.*, *Castillo v. Dean Witter Discover & Co.*, No. 97-1272, 1998 WL 342050, at *10 (S.D.N.Y. June 25, 1998) (stating that "while a desire to profit may motivate a person to commit fraud, allegations that defendants 'stand[] to gain economically from fraud do not satisfy the heightened pleading requirements of Rule 9(b)'") (quoting *ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.*, 957 F. Supp. 1308, 1327 (S.D.N.Y. 1997)). In *In re Comshare*,

we stated that "alleging facts that illustrate nothing more than a defendant's motive and opportunity to commit fraud" is not enough to meet the PSLRA's pleading requirement. 183 F.3d at 551; *accord Fidel v. Farley*, 392 F.3d 220, 232 (6th Cir. 2004) ("[A] plaintiff cannot meet PSLRA's pleading requirements by 'alleging facts that illustrate nothing more than a defendant's motive and opportunity to commit fraud.'") (quoting *In re Comshare*, 183 F.3d at 551). Moreover, Plaintiffs were on notice that Morgan Stanley's brokers could earn higher commissions on certain classes of funds: the fund prospectus states that brokers could "receive different compensation for selling each Class of shares." (JA 65.)

Therefore, because Plaintiffs have not satisfied the pleading requirements of the PSLRA for their Section 10(b) and Rule 10b-5 claims, we affirm the district court's grant of Morgan Stanley's motion to dismiss.

## C. Plaintiffs' Claims Under Rule 10b-5(a) and (c)

Morgan Stanley contends that Plaintiffs abandoned their claims under Rule 10b-5(a) and (c) because they did not raise these claims in their opening brief. (Appellee's Br. 24 n.18.) Morgan Stanley cites to *Sommer v. Davis*, 317 F.3d 686, 691 (6th Cir. 2003), and *Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 462 (6th Cir. 2003), to support its argument that Plaintiffs abandoned on appeal their claims under Rule 10b-5(a) and (c). Both *Sommer* and *Marks* support Morgan Stanley's argument. In *Marks*, we explained that "[a]n appellant waives an issue when he fails to present it in his initial briefs before this court." *Marks*, 342 F.3d at 462; *see also United States v. Newsom*, 452 F.3d 593, 607 (6th Cir. 2006) (holding that Newsom waived any objection to the jury instructions because he failed to raise the issue on appeal) (citing *United States v. Still*, 102 F.3d 118, 122 n.7 (5th Cir. 1996) ("[A]n appellant abandons all issues not raised and argued in its *initial* brief on appeal.")); *Sommer*, 317 F.3d at 691 (concluding that Sommer abandoned any arguments challenging the district court's award of summary judgment to defendant because the arguments were not raised in Sommer's opening brief).

Plaintiffs' opening brief is devoid of any reference to Rule 10b-5(a) or (c). In their opening brief, Plaintiffs only refer to Rule 10b-5 generally, without mentioning a specific subsection under which they are asserting their claims. *See, e.g.*, Appellant's Br. 18 ("Plaintiffs therefore allege that defendant acted intentionally and/or recklessly in selling securities to plaintiffs in violation of SEC Rule 10b-5."); Appellant's Br. 26 ("[P]laintiffs have alleged facts that give rise to the 'strong inference of recklessness' required for plaintiffs' Rule 10b-5 claim."). The first mention of Rule 10b-5(a) and (c) by Plaintiffs is in their reply brief, and even then the discussion is short, comprising a mere one-and-a-half pages.[2] (Appellant's Reply Br. 34-35.) Plaintiffs do distinguish between the three subsections of Rule 10b-5 in their complaint, alleging specific claims for relief under Rule 10b-5(a), (b), and (c). (JA 22-25.) Plaintiffs, however, parrot the language of the rule, stating that Morgan Stanley "intentionally and/or recklessly employed devices, schemes and artifices to defraud," but do not allege specific facts from which to conclude that Morgan Stanley did in fact engage in a scheme to defraud investors. (*Id.* 23.)

Accordingly, because claims under Rule 10b-5(a) and (c) are distinct from claims under Rule 10b-5(b) and because Plaintiffs do not distinguish between their claims under each subsection of Rule 10b-5 until their reply brief, Plaintiffs abandoned their claims under subsections (a) and (c) of Rule 10b-5.

---

[2]Specifically, Plaintiffs argue that "[g]iving proper effect to the plain language of these subsections, a jury could reasonably conclude that [Morgan Stanley's] recommendation of Class B shares to plaintiffs constituted a device or artifice to defraud and an act or practice which operated as a fraud and deceit." (Appellant's Reply Br. 35.)

**D. Plaintiffs' State-Law Claims**

The district court dismissed Plaintiffs' state-law claims under Tenn. Code Ann. §§ 48-2-121(a) and Ala. Code § 8-6-19 because it lacked subject-matter jurisdiction over those state claims. The court explained that it "does not retain supplemental jurisdiction without original jurisdiction. Because the Court has dismissed Plaintiffs' federal claims, it no longer retains supplemental jurisdiction." *Clemens Trust*, slip op. at 10.

We review a district court's decision regarding the exercise of its supplemental jurisdiction under an abuse-of-discretion standard. *Hankins v. The Gap, Inc.*, 84 F.3d 797, 802 (6th Cir. 1996). The district court had original jurisdiction over Plaintiffs' federal-law claims and accordingly could have exercised supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367(a). Under 28 U.S.C. § 1367(c)(3),[3] it was within the district court's discretion to decline to exercise jurisdiction over Plaintiffs' state-law claims once it dismissed the federal claims. In *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 n. 7 (1988), the Supreme Court explained that "in the usual case in which all federal law claims are eliminated before trial, the balance of factors to be considered . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.*; *see also Taylor v. First of Am. Bank-Wayne*, 973 F.2d 1284, 1287 (6th Cir. 1992) ("Generally, if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well.") (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) (internal quotation marks omitted)). Further, Plaintiffs do not address the dismissal of their state-law claims in their brief and thus have waived any argument that the district court erred in dismissing those claims. *See Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 311 (6th Cir. 2005) (concluding that appellant's "failure to raise an argument in his appellate brief constitutes a waiver of the argument on appeal"). Thus, the district court did not abuse its discretion in declining to exercise supplemental jurisdiction over Plaintiffs' state-law claims.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's grant of Morgan Stanley's motion to dismiss Plaintiffs' complaint.

---

[3]Section 1367(c)(3) allows a district court to "decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).