NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0142n.06
Filed: March 10, 2008

No. 07-3300

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

DONNA SAXE, Executor of the Estate of
Ronald Saxe, deceased, and DONNA SAXE,

        Plaintiffs-Appellants,

v.

THOMAS P. DLUSKY,

        Defendant-Appellee.

_____/

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE SOUTHERN
DISTRICT OF OHIO

BEFORE: BOGGS, Chief Judge; GIBBONS, Circuit Judge; and BELL, Chief District
Judge.[*]

PER CURIAM. Plaintiff-Appellant Donna Saxe ("Saxe") appeals the district court's

grant of summary judgment in favor of Defendant-Appellee Thomas P. Dlusky ("Dlusky")

based on the district court's determination that Saxe had not raised a genuine issue of

material fact with regard to her Securities Exchange Act claim. Saxe also appeals the district

court's decision to decline to exercise supplemental jurisdiction over her state law claims.

This is Saxe's second appeal. The district court had previously granted summary judgment

for Dlusky *sua sponte* and this court reversed and remanded in an unpublished opinion. On

---

[*]The Honorable Robert Holmes Bell, Chief United States District Judge for the
Western District of Michigan, sitting by designation.

remand Dlusky again moved for summary judgment, and again the district court granted summary judgment in favor of Dlusky. For the reasons set forth below, we affirm the judgment of the district court.

## I.

Saxe is the widow of Ronald Saxe and the executor of his estate.[1] Dlusky and Ronald Saxe were partners in the accounting firm of Pritchett, Dlusky & Saxe ("PDS Accounting"). Dlusky and Ronald Saxe also each owned a twenty-five percent interest in PDS Planning Inc., a closely held financial planning firm. Robert Hamilton owned the remaining fifty percent of PDS Planning.

Ronald Saxe died on December 29, 1997. In June 1998 Dlusky approached Saxe about purchasing Ronald Saxe's twenty-five percent interest in PDS Planning. Dlusky offered Saxe $30,000 for the twenty-five percent interest. Dlusky based this figure on the "rule of thumb" valuation of four and one-half times the previous year's profits. Donna and Ronald Saxe's son, Douglas Saxe, assisted his mother in the transaction. Douglas Saxe is an accountant and was then a partner in PDS Accounting. Douglas Saxe had previously prepared tax returns for Dlusky and assisted with payroll and financial statements for PDS Planning. Saxe waived the right to have the estate's interest in PDS Planning appraised, and the probate court approved the transaction. The lawyer for Ronald Saxe's estate drafted the document memorializing the sale. The sale was executed on November 23, 1999.

---

[1]The court uses Saxe to refer to Donna Saxe in both her personal capacity and as executor of the Estate of Ronald Saxe.

In July 2000 Hamilton offered Dlusky $250,000 for the fifty percent interest in PDS Planning that he then owned. Dlusky accepted Hamilton's offer. The sale was executed in July 2000, but the documents were backdated to January 1, 2000. As a result of the sale, Hamilton became the sole shareholder of PDS Planning. As part of the sale to Hamilton, Dlusky agreed to serve as a consultant to PDS Planning after the sale to facilitate the transition of clients to Hamilton.[2]

On January 3, 2003, Saxe filed this lawsuit alleging violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, as well as six state law claims. Saxe and Dlusky then filed cross-motions for summary judgment. On September 16, 2004, the district court granted summary judgment in favor of Dlusky based on Saxe having failed to establish that Dlusky made any material misrepresentations or omissions in connection with his purchase of Ronald Saxe's twenty-five percent interest in PDS Planning. The district court also declined to exercise supplemental jurisdiction over Saxe's state law claims and dismissed those claims without prejudice. On January 6, 2006, this court reversed the district court's grant of summary judgment, concluding that the district court erred in *sua sponte* granting summary judgment for Dlusky on the materiality of the misrepresentations or omissions under § 10(b) and Rule 10b-5, which had not been raised in the parties' cross-motions for summary judgment. On remand Dlusky moved for summary judgment as to whether the alleged misrepresentations

---

[2]In addition to the $250,000, Hamilton paid Dlusky a total of $80,000 between 2000 and 2004 for Dlusky's consulting services. (J.A. at 100.)

and omissions were material. On February 6, 2007, the district court again granted summary

judgment in favor of Dlusky based on Saxe having failed to establish that Dlusky made any

material misrepresentations or omissions.

## II.

### A.

This court reviews a district court's grant of summary judgment de novo. *Holloway*

*v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000) (en banc). Summary judgment may be granted

only if "there is no genuine issue as to any material fact" and "the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(c). If the moving party carries its burden

of demonstrating the absence of any genuine issue of material fact, then the nonmoving party

must set forth specific facts showing a triable issue of material fact. *Celotex Corp. v. Catrett*,

477 U.S. 317, 324-25 (1986). The court must construe the evidence and draw all reasonable

inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 587-88 (1986). Nevertheless, the mere existence of a scintilla of

evidence in support of the nonmoving party's position is insufficient to create a genuine issue

of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### B.

To prevail on a securities fraud claim under § 10(b)(5) and Rule 10b-5, "a plaintiff

must establish (1) a misrepresentation or omission, (2) of a material fact, (3) made with

scienter, (4) justifiably relied on by plaintiffs, and (5) proximately causing them injury."

*Helwig v. Vencor, Inc.*, 251 F.3d 540, 554 (6th Cir. 2001) (en banc) (citing *Aschinger v.*

*Columbus Showcase Co.*, 934 F.2d 1402, 1409 (6th Cir. 1991)). The district court granted summary judgment based on Saxe having failed to establish that Dlusky made any material misrepresentations or omissions in relation to his purchase of Ronald Saxe's twenty-five percent interest. Saxe contends that the district court erred in concluding that Dlusky had not misrepresented or omitted material information about PDS Planning.

"[I]n order to prevail on a Rule 10b-5 claim, a plaintiff must show that the statements were misleading as to a material fact. It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant." *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988). "'[M]ateriality depends on the significance the reasonable investor would place on the withheld or misrepresented information.'" *Helwig*, 251 F.3d at 555 (quoting *Basic*, 485 U.S. at 240). The test for materiality in securities fraud cases is fact-intensive. *Id.*

Saxe contends that the district court erred in concluding that there was not a genuine issue of material fact regarding the following alleged misrepresentations: (1) the profitability of PDS Planning, (2) the value of Ronald Saxe's twenty-five percent interest in PDS Planning, (3) Saxe's lack of the professional licenses necessary to own part of PDS Planning, and (4) Dlusky's plan to immediately resell his ownership interest to Hamilton.

As to the profitability of PDS Planning, Saxe alleged that Dlusky made a material misrepresentation when he represented that PDS Planning "never made much money." (J.A. at 96-97, 184.) The district court concluded that as a matter of law such a statement could not be material because it was vague and subjective. (*Id.* at 333.) The district court further concluded that Saxe had not introduced any substantial evidence that this statement was

false. (*Id.*) Saxe contends that the district court erred in concluding that the statement was not material. The state of PDS Planning's finances was material, *see Rubin v. Schottenstein, Zox & Dunn*, 143 F.3d 263, 268 (6th Cir. 1998) (en banc); however, it does not necessarily follow that Dlusky's statement was material. Dlusky's statement in this context represents Dlusky's opinion about the quality of PDS Planning's profitability, not a statement about PDS Planning's actual profits. *See In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 571-72 (6th Cir. 2004). "'Material statements which contain the speaker's opinion are actionable under Section 10(b) of the Securities Exchange Act if the speaker does not believe the opinion and the opinion is not factually well-grounded.'" *Helwig*, 251 F.3d at 562 (quoting *Mayer v. Mylod*, 988 F.2d 635, 639 (6th Cir. 1993)). Saxe contends that Dlusky's statement was false because PDS Planning paid Dlusky $67,800 in 1998 and $77,552 in 1999. (J.A. at 88-89, 128-29.) In 1998 and 1999 Dlusky worked for PDS Planning by bringing in clients and providing other assistance as requested by Hamilton. (*Id.* at 88-89.) Dlusky's income from PDS Planning in 1998 and 1999 does not demonstrate that Dlusky did not believe his statement that PDS had "never made much money." *See In re Ford Motor Co. Sec. Litig.*, 381 F.3d at 571-72.

As to the value of Ronald Saxe's twenty-five percent interest in PDS Planning, Saxe alleged that Dlusky made a material misrepresentation when he represented to Saxe that the twenty-five percent interest was worth $30,000. (J.A. at 91.) Saxe's principal contention in support of the $30,000 figure being a material misrepresentation is that Dlusky sold his fifty percent interest to Hamilton for $250,000, which effectively valued a twenty-five percent

interest at $125,000. The district court concluded as a matter of law that the difference in the purchase prices did not support an inference that Dlusky misrepresented the value of Saxe's twenty-five percent share. (*Id.* at 333.) These two transactions occurred in distinct contexts. Dlusky was a participant in PDS Planning and had the ability to facilitate the transition of clients to Hamilton. Additionally, Hamilton made his offer two years later and the transaction made him the sole owner of PDS Planning. Upon consideration of these distinctions, the difference between the amount paid in these two transactions does not support an inference that Dlusky materially misrepresented the value of Ronald Saxe's twenty-five percent interest to Saxe.

As to Saxe lacking the professional licenses (e.g., certified financial planner) necessary to own part of PDS Planning, Saxe alleged that Dlusky made a material misrepresentation when he represented to Saxe that she had to be professionally licensed to own part of PDS Planning. (J.A. at 92.) Dlusky has acknowledged that Saxe would not need to be professionally licensed to own part of PDS Planning. (*Id.* at 92-94.) The compensation paid to an individual shareholder of PDS Planning was in part based on the revenue that he or she generated. (*Id.* at 85-88.) No contention has been made that someone could offer financial planning or investment advice through PDS Planning without the appropriate professional licenses. Although someone could legally own twenty-five percent of PDS Planning without holding any professional licenses, practically such a person would have derived very little benefit from such ownership because he or she would have been unable to offer professional services in the form of financial planning or investment advice. Hence

such a person would be unable to generate business for PDS Planning and would not receive the associated compensation. Based on the professional licenses required to offer professional services through PDS Planning and the compensation scheme employed by PDS Planning, Dlusky did not make a material misrepresentation to Saxe about the significance of her lack of professional licenses.

As to Dlusky's plan to immediately resell his ownership interest to Hamilton, Saxe alleged that Dlusky made a material omission in not disclosing that he was going to sell his interest to Hamilton. Saxe alleged that the two sales were only six weeks apart and that Dlusky knew of the sale to Hamilton at the time he purchased Saxe's shares. Dlusky and Saxe agreed on the purchase price in June 1998.[3] Dlusky and Hamilton agreed on the purchase price for their transaction in July 2000. Saxe contends the dates on the documents memorializing the two transactions should govern this analysis. As to the sale between Dlusky and Saxe there is no dispute that the agreement was reached in June 1998, though the transaction was not completed until November 23, 1999. (J.A. at 30.) As to the sale between Dlusky and Hamilton, the testimony is that Dlusky and Hamilton first discussed the transaction in July 2000 and completed the transaction that same month. (*Id.* at 100-01.) Although the documents are dated January 1, 2000, the unrebutted testimony is that the documents were backdated. (*Id.* at 100.) Thus two years passed between Dlusky agreeing

---

[3]Dlusky testified at his deposition that he and Saxe had agreed on the price in March 1998, but later submitted an affidavit stating that the agreement had been reached in June 1998. (J.A. at 89-91, 319.) In consideration of Saxe's contentions about the timing of the two transactions, the date more favorable to Saxe is June 1998.

to purchase Saxe's shares and Hamilton agreeing to purchase Dlusky's shares. Moreover, Saxe has offered no evidence to suggest that Dlusky knew of the possibility of a transaction with Hamilton at the time of the transaction with Saxe. Therefore Dlusky did not make a material omission in not disclosing the sale to Hamilton.

The district court properly concluded that as a matter of law Dlusky did not make any material misrepresentations or omissions in his purchase of Saxe's shares. In the absence of any material misrepresentations or omissions Saxe cannot prevail on her § 10(b)(5) and Rule 10b-5 claim. Therefore Saxe did not raise a genuine dispute of material fact with regard to her Securities Exchange Act claim and Dlusky was entitled to summary judgment.

III.

Saxe also appealed the district court's decision to decline to exercise supplemental jurisdiction over her state law claims. Although this court's prior opinion indicated that Saxe had appealed the district court's decision to decline to exercise supplemental jurisdiction over Saxe's state law claims, the district court concluded that Saxe had not appealed the dismissal of the state law claims. (J.A. at 269, 323.) Instead the district court concluded that the state law claims were no longer before it because Saxe had filed her state law claims in state court. (*Id.* at 271, 278 n.2, 323.) As the state law claims were in fact before the district court, *Sagan v. United States*, 342 F.3d 493, 500-01 (6th Cir. 2003), this court will evaluate those claims as if the district court had again decided to decline to exercise supplemental jurisdiction over the state law claims for the reasons stated in the district court's first summary judgment opinion. (J.A. at 263.)

This court reviews a district court's decision to decline to exercise supplemental jurisdiction for abuse of discretion. *Robert N. Clemens Trust v. Morgan Stanley DW, Inc.*, 485 F.3d 840, 853 (6th Cir. 2007). If a district court has dismissed all of the claims over which it has original jurisdiction then the court may decline to exercise supplemental jurisdiction over the state law claims. 28 U.S.C. § 1367(c)(3). The decision whether to exercise supplemental jurisdiction "depends on 'judicial economy, convenience, fairness, and comity.'" *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254 (6th Cir. 1996) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).

The district court had original jurisdiction over Saxe's § 10(b)(5) and Rule 10b-5 claim and could have exercised supplemental jurisdiction over Saxe's state law claims. 28 U.S.C. § 1367(a). However, "'in the usual case in which all federal law claims are eliminated before trial, the balance of factors to be considered . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.'" *Robert N. Clemens Trust*, 485 F.3d at 853 (omission in *Robert N. Clemens Trust*) (quoting *Carnegie-Mellon Univ.*, 484 U.S. at 350 n.7). On appeal Saxe has not identified any factors in favor of the district court exercising supplemental jurisdiction. Therefore the district court did not abuse its discretion in declining to exercise supplemental jurisdiction over Saxe's state law claims.

IV.

For the foregoing reasons, we AFFIRM the judgment of the district court.